**UNITED STATES of America**

v.

**Hugh T. FULLERTON.**

**Cr. A. No. 25311.**

United States District Court
D. Maryland.

Nov. 18, 1960.

Leon H. A. Pierson, U. S. Atty., Baltimore, Md., for plaintiff.

James M. McInerney, Washington, D. C., and John H. Mitchell, LaPlata, Md., for defendant.

R. DORSEY WATKINS, District Judge.

Defendant is charged in a three-count criminal information with the violation of 26 U.S.C.A. § 7203, in that in the years 1955, 1956 and 1957 "he did wilfully and knowingly fail to make" the income tax returns required for the immediately preceding years.

The applicable portions of section 7203 of 26 U.S.C.A. are as follows:

"Any person * * * required by this title * * * to make a return * * * who willfully fails to * * * make such return * * * shall * * * be guilty of a misdemeanor * * *."

The case was tried to the Court without a jury. From the stipulated facts and those established by the uncontradicted evidence, it is clear that defendant was a "person required" to file income tax returns for the years in question and that he knowingly did not do so. The only question is whether or not these failures were "willful." It is the Court's conclusion that they were.

### Facts.

As the question presented involves a state of mind, a rather full statement of the background facts is required.

Defendant, a member of the Bar, and who had been a member of the California National Guard since 1931, was called to active duty in 1941, with the rank of Captain. At that time he was married and had one child, and was an associate, at a modest salary, in one of the West Coast's largest law firms. He had filed income tax returns for the years 1939, 1940 and 1941.

In February of 1943 defendant was assigned to the defense in Phoenix, Arizona of some thirty soldiers who were

being court martialled on mutiny charges. He devoted full time to this work except for a four day period in March 1943, when he was absent because of his father's death. He requested and was granted extensions for filing until April 15, 1943 and again to May 1, 1943. He was actively militarily engaged until December 1943, when he left California for Europe, at which time his income tax return for 1942 had not been filed. He arrived in England in January 1944, and in June was transferred to Normandy, France, from which his military duties carried him to Rennes, Cherbourg, Reims and then Germany, until his return to the United States in October 1945. He was honorably discharged on December 15, 1945 and was formally separated from the service in March 1946.

Defendant took a tax manual to Europe with him, but never completed his 1942 return, although he testified that he collected data for this return. Before his 1943 return was due, he learned of his right to defer payment of taxes until six months after termination of military service.[1] With this and other legislation,[2] and military personnel exemptions, his taxes for the years 1942 through 1945 would have been only $64.67.

In December 1945, defendant returned to his associate status with his old law firm. In March 1946, he filled out all the figures required for the 1945 return, and computed the tax, but when faced with answering the question if he had filed returns for preceding years, he could not bring himself to answer. Again, in 1947 and before the due date, he prepared his 1946 return, but again was stymied by the question as to filing for previous years. He fully realized his answer would disclose his failure to file for earlier years. He could not face the disgrace to himself, his family, his standing at the Bar and in the National Guard; and he feared (probably unnecessarily) criminal prosecution. He was able in part to solace himself by the realization that taxes were being withheld by his employer from his salary, and by the National Guard, and that W-2 forms were being filed. In fact, in 1948 his employer obtained for him, without any action on his part, a refund for overpayment of taxes withheld in 1947.[3] This condition of awareness but failure to file continued through 1948, when even the fragile partial self-justification, that the W-2's might put the Government on notice, was lost.

On January 1, 1949, defendant became a partner in his law firm, and was transferred to its Washington office. His income at once, and steadily, increased.[4] While he knew that the partnership returns of his law firm showed his distributable share, this was not as pointed as the W-2's, which had not led the Government to him. He now had the additional deterrent of "not letting his partner friends down." He testified that he was afraid to bring the matter to the attention of the Government directly; he did

1. Soldiers' and Sailors' Civil Relief Act of 1940, section 513, 50 U.S.C.A.Appendix, § 573.

2. Current Tax Payment Act of 1943, 26 U.S.C.A. § 1621 et seq.

3. Counsel for defendant comment that "surprisingly the Government made no inquiry concerning his non-filing of returns." The comment may be entirely justified. However, it brought home to the defendant the fact that the Government had not picked up his failure to file, and that not only was there no certainty, but there seemed little likelihood, that the Government would in the future discover this failure unless it were specifically disclosed in defendant's personal return.

4. In 1946, 1947 and 1948, his gross earnings, primarily from his employment as a law associate, were roughly $8,500, $10,500 and $12,100. In 1949 his gross income, primarily as a law partner, was in excess of $18,000. For the years 1950–1956 inclusive, his gross earnings averaged substantially in excess of $30,000 a year.

not want the Government to know; and it had not picked up his failures.[5]

In 1958 defendant received a mimeographed form letter, sent by the Internal Revenue Service to members of various professions and occupations from whom no returns had been received in three years, inquiring as to where returns for the years 1954, 1955 and 1956 had been filed. Defendant then came into the office of the Internal Revenue Service in early January 1958, with the form letter, and admitted that he had not filed since the Second World War. He appeared to be nervous and upset, stated that he had been "expecting this, and was glad it was all over; that he had nothing to conceal"; but that he wanted to consult an attorney. His written interview of December 18, 1958, and typewritten statement of January 6, 1959 therefore are assumed by the court to be the best statement by defendant that could be given after a period of at least reasonable consultation and consideration.[6]

This interview, and the supplementary statement, are unfortunately (from a defense standpoint) condemnatory through their honesty. Defendant admitted that in 1947 or 1948 his wife received an inheritance (very substantial) which would have led to the filing of separate returns; and that he could not give an estimate of living expenses, household maintenance, furnishings, travel or vacation expense, home alterations and repairs, automobile, medical, amusement and entertainment expenses on an income (from 1951–1956) averaging over $32,-000 a year. He frankly admitted that "at the time" he "failed to file income tax returns with the Internal Revenue Service for the years 1945 to 1956 inclusive" he knew that he should have filed such returns. In connection with his service in the Washington office of his firm, he was admitted to practice before the Federal Trade Commission, The Securities and Exchange Commission, the General Accounting Office, the Defense Department, and "practically any Government agency in Washington."

In his supplementary written statement, defendant denied "any intent or desire to evade the law or my tax obligations" but based his failure to file timely tax returns "on a constantly mounting fear and dread that my life, family and professional career would be destroyed if *my delinquencies were disclosed.*"[7] He explained that he knew that under Treasury Regulations he did not have to file returns for 1943 and 1944 until March 15, 1946, at which time his 1945 tax return would also be due. At that time he knew that his return for 1942 had not been filed, and that he "had no legally acceptable excuse for not having done so." He suggests that his estimate of nominal tax liability for 1944 and 1945 has in fact been confirmed, and that the "figures strongly suggest a fear of filing rather than an intent to evade these nominal obligations."[8]

5. Unfortunately, he did not learn of the "voluntary disclosure program" under which taxpayers in default were allowed to volunteer their status and settle their civil liabilities without criminal prosecution, until a year after it had been terminated.

A case of lack of shoes for the shoemaker's family?

6. This contains no invidious implication. The court considered that defendant, in his testimony, was completely honest and truthful, and the court does not intend to imply that thought and advice resulted in any conscious or material change in explanation or position. The court's sympathy was and is existent to an essentially honest and capable person, who, in the court's opinion, made an unfortunate and initially relatively insignificant mistake, but who, especially in view of his position and profession, sought to evade disclosure of his liabilities in an intended and continued policy of inaction. As an intelligent lawyer, defendant readily admitted that he could not expect a yearly repeated "miracle" of nondiscovery. The court fully recognizes the severe, continued and ever present burden under which defendant was laboring; all the more severe in the case of a sensitive, and otherwise conscientious, person.

7. Emphasis here, and hereafter, supplied.

8. The "fear of filing" was of course to avoid an assessment, and payment, and

Defendant's statement continues that another factor (withholding and W–2's in 1945 et seq.) "intervened to *convince me that inaction and nonfiling was somehow the lesser evil to confessing my delinquency and exposing myself to possible criminal sanctions and disgrace.*"

Defendant in his statement admits that this "pattern of substantial compliance with my tax obligations in the post-war years was *disturbed* in 1949" when he became a partner in his firm, at which time he *"was back on a self-assessment basis.* My plight before was serious but now it became desperate. I had so much more to excuse by now and also so much more to lose if my *deficiencies were disclosed.* The more I worried over and considered the problem and some possible solution, the more bitterly I realized that *I had embarked upon a road which had no turning, that the die was cast and that I could do nothing but await the present eventuality. My failure to act and to file returns* were due entirely to a paralysis of fright and not to any intent to evade my tax obligations."

### Discussion.

Defendant has been indicted under U. S.C. Title 26, section 7203 for willful failure to file income tax returns when due (the misdemeanor section) and not under U.S.C. Title 26, section 7201 for willful attempt to evade or defeat income taxes or the payment thereof (the felony section). A failure or unwillingness to recognize this distinction pervades defendant's entire approach and argument.

Defendant emphasizes that "willfully" in criminal statutes means something more than voluntarily. The language of the cases fully supports this distinction. The two Supreme Court cases [9] cited by defendant are however of little comfort to him in their illustrations of what is willful.

in that sense to "evade" (avoid, prevent, not make) payment. See subsequent discussion. He certainly knew that the "obligations" for subsequent years were not "nominal."

In Murdock the court found that where defendant had refused to give information to the Internal Revenue Bureau for fear it might subject him to state criminal proceedings, before determination by the Supreme Court that this was not a justification for refusal to answer, he was entitled to an instruction under which, although the "refusal to answer was intentional and without legal justification * * * the jury might nevertheless find that it was not prompted by bad faith or evil intent * * *" (290 U.S. at pages 397–398, 54 S.Ct. at page 226).

The court had previously pointed out (290 U.S. at pages 394–395, 54 S.Ct. at page 225) that willfully when used in a criminal statute "generally means an act done with a bad purpose"; "without justifiable excuse"; "stubbornly, obstinately, perversely"; or to characterize "a thing done without ground for believing it is lawful"; or "conduct marked by careless disregard whether or not one has the right so to act."

Spies involved conviction on an indictment for the felony of willfully attempting to evade or defeat a tax. The court pointed out the "willful failure to make a return, keep records, or supply information when required, is made a misdemeanor, without regard to existence of a tax liability. * * *" (317 U.S. at page 496, 63 S.Ct. at page 367).

The court then continues (at pages 497–498, 63 S.Ct. at page 367, emphasis supplied), the defendant relying upon the next to the last sentence:

"The difference between willful failure to pay a tax when due, which is made a misdemeanor, and willful attempt to defeat and evade one, which is made a felony, is not easy to detect or define. Both must be willful, and willful, as we have said, is a word of many meanings, its.

9. United States v. Murdock, 1933, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381; Spies v. United States, 1943, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418.

construction often being influenced by its context. United States v. Murdock, 290 U.S. 389 [54 S.Ct. 223, 78 L.Ed. 381]. It may well mean something more as applied to non-payment of a tax than when applied to failure to make a return. Mere voluntary and purposeful, as distinguished from accidental, omission to make a timely return might meet the test of willfulness. But in view of our traditional aversion to imprisonment for debt, we would not without the clearest manifestation of Congressional intent assume that mere knowing and intentional default in payment of a tax *where there had been no willful failure to disclose the liability* is intended to constitute a criminal offense of any degree. We would expect willfulness in such a case to include some element of evil motive and want of justification in view of all the financial circumstances of the taxpayer."

The italicized clause certainly does not condone defendant's conduct.

The court further said (317 U.S. at pages 498–499, 63 S.Ct. at page 368):

" * * * The difference between the two offenses, it seems to us, is found in the affirmative action implied from the term 'attempt,' as used in the felony subsection. It is not necessary to involve this subject with the complexities of the common-law 'attempt'. The attempt made criminal by this statute does not consist of conduct that would culminate in a more serious crime but for some impossibility of completion or interruption or frustration. This is an independent crime, complete in its most serious form when the attempt is complete, and nothing is added to its criminality by success or consummation, as would be the case, say, of attempted murder. Although the attempt suc-

ceed in evading tax, there is no criminal offense of that kind, and the prosecution can be only for the attempt. We think that in employing the terminology of attempt to embrace the gravest of offenses against the revenues, Congress intended some willful commission in addition to the willful omissions that make up the list of misdemeanors. Willful but passive neglect of the statutory duty may constitute the lesser offense, but to combine with it a willful and positive attempt to evade tax in any manner or to defeat it by any means lifts the offense to the degree of felony."

Defendant principally relies upon language in Yarborough v. United States, 4 Cir., 1956, 230 F.2d 56, certiorari denied 1956, 351 U.S. 969, 76 S.Ct. 1034, 100 L.Ed. 1487; Ripperger v. United States, 4 Cir., 1957, 248 F.2d 944, certiorari denied 1958, 355 U.S. 940, 78 S.Ct. 428, 2 L.Ed.2d 421; Haskell v. United States, 10 Cir., 1957, 241 F.2d 790, certiorari denied 1957, 354 U.S. 921, 77 S.Ct. 1379, 1 L.Ed.2d 1436; United States v. Cirillo, 3 Cir., 1957, 251 F.2d 638, certiorari denied 1958, 356 U.S. 949, 78 S.Ct. 914, 2 L.Ed.2d 843.[10] Typical is the approved instruction in Yarborough (230 F.2d at page 61):

" 'I instruct you that the only bad purpose or bad motive, which it is necessary for the Government to prove in this case is the deliberate intention not to file returns which the defendant knew ought to have been filed, so that the Government would not know the extent of the liability.' "

The critical language is " 'so that the Government would not know the extent of the liability.' " "So that" may mean either "with the result that", or "in order that." The former would seem to be the appropriate construction in a misdemeanor case of failing to file. The

---

10. Defendant also relies upon discussions of willfulness in Wilson v. United States, 9 Cir., 1957, 250 F.2d 312, 325; United States v. Palermo, 3 Cir., 1958, 259 F.2d 872, 882, reversing United States v. Palermo, D.C.E.D.Pa.1957, 157 F.Supp. 578—a case of willful failure to pay.

latter is urged by defendant, who on such construction would have the court conclude:

> "Thus, if a taxpayer is to be convicted for a wilful failure to file a return, the government must prove the existence of a specific wrongful intent—i. e. an evil motive—at the time the crime charged was committed; namely, that the taxpayer failed to make a return with criminal intent to conceal from the government the extent of his income, and, thus, his tax liability." [11]

This is an apparent attempt to equate the requirements of the misdemeanor of willful failure to file a return (U.S.C. 26, sec. 7203) with those of the felony of a willful attempt to evade or defeat a tax, or the payment thereof (26 U.S.C. § 7201).[12]

Certainly defendant's conduct was, within the tests set forth in Murdock, 290 U.S. at pages 394–395, 54 S.Ct. at page 225 "done with a bad purpose"; "stubbornly, obstinately"; it was "a thing done without ground for believing it is lawful", defendant expressly recognizing that he knew he should have filed returns and that he thereafter refrained from filing "as the lesser evil to confessing any delinquency and exposing myself to possible criminal sanctions and disgrace." The failure to file falls well within the definition in Hargrove v. United States, 5 Cir., 1933, 67 F.2d 820, 823, 90 A.L.R. 1276, strongly relied upon by defendant, as a case of "a specific wrongful intent, that is, actual knowledge of the existence of obligation and a wrongful intent to evade it * * *."

The failure to file for 1942 may, within Yarborough and similar cases, have been accidental, inadvertent or negligent. The subsequent omissions were voluntary, purposeful, deliberate and intentional. Defendant frankly admits he had no intention of filing thereafter—"the die was cast". He knew that the Government had not learned, through W–2's or the partnership returns, of defendant's income or of his tax liabilities, although he also knew that since 1948 he was "on a self-assessment basis." This nonfiling was "so that the Government would not know the extent of the liability" [13] whether "so that" means "with the result that" or "in order that."

■ The court finds that defendant's failures to file, for the years in question, were each without justifiable excuse. The court is of the opinion that in a prosecution such as this, under 26 U.S.C. § 7203, it is not necessary for the Government to prove that defendant intended or attempted to evade the payment of taxes indefinitely or at all; but if the Government did have such a burden, the court finds that it is met in this case.[14]

The court is satisfied beyond a reasonable doubt, and so finds, that the defendant is guilty as charged.

---

11. Defendant's Original Memorandum, page 8.

12. Defendant's Supplemental Memorandum, page 2, apparently contends that the Government must establish "the crime of willful attempted tax evasion * * *"

13. While defendant probably had at the beginning of each year funds sufficient to pay the tax for the preceding year, he did not, in the years in question, have sufficient funds to discharge the liability for the preceding years. His income was spent in travelling and entertainment.

14. Defendant argues that it was "fright" and not a desire not to pay which governed his conduct. But he did desire to continue the non-disclosure of his income, the disclosure of which would have led to claims for payment. Moreover, he made no preparation for the ultimate discharge of his tax liability by the accumulation of the necessary funds, let alone the creation of a special account for such purposes.