**Robert P. LORD,**
Appellee-Cross-Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE,**
Appellant-Cross-Appellee.

Nos. 74–1080, 74–1120.

United States Court of Appeals,
Ninth Circuit.

Oct. 14, 1975.

George G. Wolf (argued), Atty., I. R. S., Washington, D. C., for appellant in 74–1080 and appellee in 74–1120.

Richard P. Matthews (argued), of LeSourd, Patten, Fleming & Hartung, Se-

attle, Wash., for appellee in 74–1080 and appellant in 74–1120.

## OPINION

Before DUNIWAY and WALLACE, Circuit Judges, and MURPHY,* District Judge.

MURPHY, District Judge:

The Commissioner and the taxpayer appeal from a decision of the United States Tax Court (*Lord v. Commissioner*, 60 T.C. 199 (1973)). The Commissioner's appeal is from the Tax Court's refusal to uphold the 50% fraud penalty on a $63,-366.82 deficiency in the taxpayer's income tax liability for the years 1961 through 1966. The taxpayer appeals from so much of the Tax Court's decision holding that taxpayer's income during five of those years was his separate property and not community property. On the Commissioner's appeal, we reverse. We affirm on the taxpayer's appeal, adopting the Tax Court's opinion on the community property issue.

Our jurisdiction is derived from 26 U.S.C. § 7482(a), which provides:

"(a) Jurisdiction. The United States Courts of Appeals shall have exclusive jurisdiction to review the decisions of the Tax Court, * * * in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury; * * *."

Accordingly, "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." (Fed. R.Civ.P. 52(a)). See *Commissioner v.*

*Duberstein*, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).

After a thorough review of the entire record, we are satisfied that the Tax Court's finding that the Commissioner had failed to sustain his burden[1] of proving fraud is clearly erroneous, since we are left with the definite and firm conviction that a mistake has been committed. *United States v. U. S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *In re U.S.A. Motel Corp.*, 450 F.2d 499, 503–504 (9th Cir. 1971).

The trial before the Tax Court was completed in two hours. The taxpayer called no witnesses and the Commissioner called three—the taxpayer, taxpayer's former wife, and taxpayer's employer. The parties also filed an agreed statement of facts. There was no issue of credibility as to any witness, nor was there any conflicting evidence. There were but two issues, the community property issue and the issue: Whether the taxpayer's failure to pay his federal income taxes for the taxable years 1961 through 1966 was due to fraud? If fraudulent, he is liable for a 50% penalty as provided in 26 U.S.C. § 6653(b).[2] We will discuss only the fraud question.

The stipulated facts were that Lord, who prior to 1960 was employed as a security salesman and branch manager of an investment firm, abandoned his wife and six children in 1960, after 23 years of marriage, and moved to the State of Washington. In 1961 he began working as a real estate salesman for MacPherson's, Inc. at its branch office at Ocean Shores, Washington. In 1962 he was made sales manager for MacPherson's. His employment with MacPher-

---

* The Honorable Thomas F. Murphy, Senior United States District Judge for the Southern District of New York, sitting by designation.

1. 26 U.S.C. § 7454(a).

    "(a) Fraud.—In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary or his delegate."

2. 26 U.S.C. § 6653(b).

    "(b) Fraud.—If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a)."

son's, Inc. continued through 1966. During the years involved he received commissions and bonuses from MacPherson's, Inc. as follows:

| Year | Total commissions paid | Year | Total commissions paid |
|------|------|------|------|
| 1961 | $16,488.29 | 1964 | $40,298.15 |
| 1962 | 46,316.60 | 1965 | 36,227.88 |
| 1963 | 30,274.91 | 1966 | 17,827.08 |

Copies of IRS Forms 1099 reflecting such commissions, which were furnished to him by MacPherson's, Inc. at the end of each year, were attached to the Stipulation of Facts; and it was further stipulated that the Forms 1099 for the years 1961 and 1962 were no longer available. Lord failed to file a federal income tax return for each of the taxable years 1961 through 1966, and failed to pay any portion of the income tax liability due from him for any of said years. On March 27, 1969, an Information was filed against Lord in the United States District Court for the Western District of Washington charging him with willfully failing to file federal income tax returns for the years 1962 through 1966 in violation of 26 U.S.C. § 7203 (Internal Revenue Code of 1954). On September 29, 1969, Lord entered a plea of guilty to Count I of said Information, willful failure to file an income tax return for the year 1962. On December 19, 1969, the United States District Court for the Western District of Washington entered its judgment of conviction upon Lord's plea of guilty sentencing him to a fine in the amount of $2,500. and confinement in a jail-type institution for a period of three months. It also placed him on probation for a period of five years.

The Forms 1099 in evidence not only indicate the commissions paid but also the employer's name and address as well as Lord's. On no Form, however, did Lord's social security number appear. Lord admitted on direct examination that MacPherson's, Inc. tried several times to get him to provide his social security number, but he never complied.

MacPherson also wrote Lord a letter on October 1, 1962, explaining the need for Lord to start saving some money to pay his income taxes. The last two paragraphs of this letter are significant. They read:

"A married man, no children, would pay $8,000 on a $30,000 income on April 15. It takes the Government approximately 30 to 90 days to start garnisheeing and raising Holy Hell.

"After reading the last paragraph, I think you can see why I feel you would be better without the Eastvold house and and [sic] make a concerted effort to turn your Ocean Shores lots into cash to meet your taxes and extravagant living expenses."

Lord admitted at trial that he was aware of his obligation to file federal income tax returns and pay federal income tax during the years in issue. Yet the Tax Court held: "We have examined all the relevant facts in the instant case and have concluded that respondent has not sustained his burden of proving fraud by clear and convincing evidence." In arriving at this conclusion the Tax Court misconstrued some of the testimony and, although cognizant of the correct legal principles involved, applied an erroneous standard.

The Tax Court premised part of its decision upon two findings of fact that are clearly erroneous. First, the Tax Court noted that taxpayer had an unstable or irregular pattern of employment. Second, the Tax Court found that taxpayer was an alcoholic.

However, except for the interval between March 24, 1960, when Lord abandoned his wife and family in Iowa, and some unidentified time in 1961 when he started his employment with MacPherson's in Washington, his work experience was exemplary. The only proof of Lord's job experience was (1) the Stipulation of Facts recited above, and (2) the taxpayer's own testimony relating both to the immediate period after he graduated from high school (probably 1932/33, since he was born on May 17, 1916) and

to the period 1958 to 1960. We quote the latter testimony in the margin.[3]

Even during this period, Lord had several jobs at used car lots. In sum, the only job instability that can be attributed to the taxpayer occurred during the hiatus when he abandoned his family and started with MacPherson's. And as to that period, all that the record shows is:

"* * * I spent a year or so not doing much, working various used car places for a few weeks * * *." (Tr. p. 17)

How long this period was or how many jobs or car lots were involved cannot be determined from the record. Parenthetically, we take judicial notice that his 1961 tax return did not have to be filed until April 15, 1962. (26 U.S.C. § 6072).

More important than the unsubstantiated finding of job instability was the Tax Court's finding that the taxpayer was an alcoholic. The record discloses only five instances where the words "drinking" or "alcoholic problem" were mentioned or implied. That testimony is also quoted in the margin.[4] The most

3. "Q. What was your work experience generally after you left high school?

A. Well, I went in the CC Camp and took a Civil Service test and from there I worked in a drugstore warehouse and passed—then I worked for the Government for several years in the Soil Conservation Service, and I think seven years or so, and two of those years I was in the Navy, two of the seven or eight, it is a long time ago. [We take judicial notice that this was during the depression.]

Q. Yes. This was all back in Minnesota and Iowa?

A. Yes.

Q. Then, in the years right before 1960, 1958, '59 and '60, where were you working?

A. Oh, the securities business—yes.

Q. What company were you working for?

A. Oh, Investor's Diversified Services and two or three companies after that.

Q. Were you also working for a firm called Waddell & Reid?

A. Yes." (Tr. p. 13)

* * * * * *

"Q. Well, then, during 1960 and '61, up through 1964, what contact did you have with your family, with your ex-wife?

A. Well, as soon as I arrived out here, I called home and then I spent a year or so not doing much, working various used car places for a few weeks and the nights in the tavern is just about what happened. That was '60, then '61 I got a Real Estate License and went to work at Ocean Shores." (Tr. pp. 16–17)

4. "Q. Mr. Lord, generally what led to the separation?

A. Well, *drinking* and financial problems, and many things." (Emphasis ours.) (Tr. p. 15)

* * * * * *

"Q. Well, did you have any intention to bring your family to Washington?

A. I hadn't thought it through that far. I wasn't thinking too straight at the time.

Q. Well, then, during 1960 and '61, up through 1964, what contact did you have with your family, with your ex-wife?

A. Well, as soon as I arrived out here, I called home and then I spent a year or so not doing much, working various used car places for a few weeks *and the nights in the tavern* is just about what happened. That was '60, then '61 I got a Real Estate License and went to work at Ocean Shores." (Emphasis ours.) (Tr. pp. 16–17)

* * * * *

"Q. Mr. Lord, we have stipulated that you did not file Income Tax Returns for the years 1961 to 1966. Why didn't you file returns for those years?

A. I didn't have any income to speak of in '60, and I didn't file—I don't think I filed then either. I don't know, but each year I put it off, I thought 'Well, this year I will go down and get everything straightened out', and I was weak enough that I didn't ever get around to it until they came out and talked to me. I guess that is it.

Q. Is it your explanation that you were short of funds at the time?

A. Well, I was short of funds, that is true.

Q. You were aware that you should be filing, is that true?

A. Well, certainly. I was aware that I should be filing. I didn't know—I went through—past the filing date in 1960, I think it was, and I didn't have an income or any chance of—I didn't have a job. *I was drinking when I could get some money*, and I just didn't file." (Emphasis ours.) (Tr. pp. 25–26)

* * * * * *

"Cross-examination" of Lord by his own counsel:

"Q. Is it not a fact, sir, that you had a terrible alcoholic problem?

that such testimony reveals is that between March, 1960 and some time in 1961, when he started with MacPherson's, the taxpayer drank when he had the money, although he admitted that he had little or no income in 1960. Yet the Tax Court found that Lord was afflicted with alcoholism,[5] a well-known disease; and it reiterated this finding six times in its opinion.

Acknowledging that Lord had a drinking problem during the interval in question and also the fact that he worked only in a few car lots at that time, immediately thereafter he functioned extremely well and made a substantial success in the real estate business, earning $187,432.91, and establishing a new life with a new wife whom he had met in 1960. These facts are highly significant because they cover the period in question.

The sole issue is, as the Tax Court correctly noted: Whether the taxpayer's failure to pay his federal income taxes for the taxable years 1961 through 1966 was due to fraud. Accordingly, the period of time involved extends from April 15, 1962 through April 15, 1967, the dates when the returns were due for the years in question. This was the period covered by the Commissioner's proof.

The Commissioner proved that the taxpayer was an intelligent businessman who, over a period of six years, received substantial income. The Commissioner further proved that the taxpayer admitted that he intentionally disregarded his obligations to file returns and pay federal income taxes; that he kept no business records; that he refused, over a six-year period, to give his employer his social security identification number; that he was warned by his employer to pay his taxes and to cease his extravagant life style; and that taxpayer's only explanation for his failure to file was his fear of incarceration and/or the loss of

his job. In addition, it had been stipulated that Lord had pleaded guilty to the charge of willfully failing to file for the taxable year 1962.

The Tax Court discounted much of the Commissioner's proof, for instance, by finding that Lord's conduct, such as his failure to keep records and his failure to supply his employer with his social security number, were merely manifestations of his underlying emotional problems and therefore not indications of fraud. As to the business records, the Tax Court felt that the taxpayer merely failed to keep "adequate records." As to Lord's failure to provide his social security number to MacPherson's, the Tax Court characterized this omission as mere procrastination.

We take note, however, that there was no testimony that Lord had any emotional problems during the period at issue (April 15, 1962 through April 15, 1967), or that his records were inadequate, or that he procrastinated in giving his social security number. To the contrary, the testimony substantiates the fact that he kept no records and that rather than postponing from day to day the giving of the social security number, he never gave it during the entire six-year period. In addition, if Lord had any emotional problems during this period, he apparently overcame them quickly, as is indicated by his substantial earnings and the new life he established for himself.

In reference to Lord's plea of guilty to the crime of willful failure to file an income tax return, the Tax Court observed that such an admission was not "conclusive but is only one of the evidentiary factors to be considered * * *." The Commissioner never argued that an admission of willful failure to file was conclusive on the issue of fraud, but only that it was highly persuasive evidence of an intent to defraud, which is precisely what we held in *Powell v. Granquist*, 252 F.2d 56, 60–61 (9th Cir. 1958).

A. Well, *I did a lot of drinking.*
Q. Well, did you have—
A. (Interrupting). On what money I had." (Emphasis ours.) (Tr. p. 30)

5. "Alcoholism. Alcohol poisoning; the morbid effect of excess in alcoholic drinks." Dorland, *The American Illustrated Medical Dictionary* 56 (22nd ed. 1951).

The most serious error, however, as we indicated at the outset, was that despite cognizance of the correct legal principles involved, the Tax Court applied an erroneous standard in deciding the issue of fraud. This mistake occurred when the Tax Court analyzed the taxpayer's testimony as to his reasons for not filing.

The Tax Court stated, at page 209 of its opinion:

"With respect to the fact that petitioner was aware of his obligation to file Federal income tax returns during the years in issue but did not do so because of his fear that he would be prosecuted and punished *for his failure to file for the year 1960*, there is no doubt that an attempt to conceal a failure to file in a prior year does constitute *some* evidence of fraud. See *Stoltzfus v. United States* [398 F.2d 1002, 3 Cir.], *supra; Fred N. Acker*, 26 T.C. 107 (1956). *However, petitioner also stated at trial that an additional factor underlying his fear of ultimate criminal prosecution and punishment for failure to file for 1960 was the anxiety that he would lose his job and would thus be thrust back into his prior pattern of job instability. This latter factor, when viewed in the perspective of petitioner's alcoholic tendencies* and *marital problems during the years in issue*, creates considerable doubt as to whether petitioner had the intent to defraud which is requisite for supporting a determination of fraud." (Emphasis ours except the word "some.")

▮ In holding that the taxpayer's fears of the consequences of a criminal prosecution (loss of job) "creates considerable doubt as to whether petitioner had the intent to defraud," the Tax Court misstated the applicable law. In the preceding sentence it correctly stated, "that an attempt to conceal a failure to file in a prior year does constitute *some* evidence of fraud." The Tax Court undercut the force of this accepted principle when it immediately added,

"underlying his fear of ultimate criminal prosecution and punishment for failure to file for 1960 was the anxiety that he would lose his job and would thus be thrust back into his prior pattern of job instability."

Such a holding is not only contrary to the taxpayer's testimony but also contrary to established authority. *Stoltzfus v. United States*, 398 F.2d 1002, 1005–06 (3d Cir. 1968), *cert. denied*, 393 U.S. 1020, 89 S.Ct. 627, 21 L.Ed.2d 565 (1969); *Acker v. Commissioner*, 26 T.C. 107 (1956), *modified on other grounds*, 361 U.S. 87, 80 S.Ct. 144, 4 L.Ed.2d 127 (1959), *aff'g* 258 F.2d 568 (6th Cir. 1958); *cf. United States v. Fullerton*, 189 F.Supp. 211, 216 (D.Md.1960).

▮ In effect, the Tax Court held that fear of criminal prosecution was a defense to, rather than an *indicium* of, fraud. The loss of one's job is frequently a consequence of a conviction—so, too, the loss of one's right to practice a profession. To attach independent significance to the underlying fears of a criminal prosecution is to open a Pandora's box of illusory defenses to the fraud penalty that would destroy the Congressional purpose of Section 6653(b).

This legal error aside, the Tax Court misstated the evidence on which it relied. On page 209 of its opinion, the Tax Court said:

"In his attempt to establish fraud, respondent has emphasized four factors: * * * (2) petitioner's admission at trial that his failure to file returns during the years in issue was predicated on his fear that his failure to file a timely return for the year 1960 would be discovered, and that he would be subject to criminal prosecution and potential imprisonment for his failure to file a timely return for 1960; * * *."

The only testimony relating to the reasons for the failure to file are on pages 25, 26, 33 and 34 of the Transcript. We quote it in the margin.[6]

---

6. "Q. Mr. Lord, we have stipulated that you did not file Income Tax Returns for the years 1961 to 1966. Why didn't you file returns for those years?

Quite obviously, even with the aid of suggestions by his own counsel, no date was fixed for this abortive confession, not even 1962. Without a date, it has no relation to his guilty plea to the one Count charging him with failure to file a 1962 return on April 15, 1963 or to any years in issue. Nor was it explained what the box full of "things" was.

Also, one will search in vain for the Tax Court's factual foundation for saying: " * * * petitioner also *stated at trial* that an additional factor underlying his fear of ultimate criminal prosecution and punishment for *failure to file for 1960* was the anxiety that he would lose his job and would *thus be thrust back into his prior pattern of job instability.*" (Emphasis ours.) (Opin. p. 209).

"Another factor which influenced our decision in petitioner's [taxpayer's] favor," said the Tax Court at p. 210, "was that he *cooperated fully* with the Internal Revenue Service and made no attempt either to conceal or mislead."

A. I didn't have any income to speak of in '60, and I didn't file—I don't think I filed then either. I don't know, but each year I put it off, I thought that 'Well, this year I will go down and get everything straightened out', and I was weak enough that I didn't ever get around to it until they came out and talked to me. I guess that is it.

Q. Is it your explanation that you were short of funds at the time?

A. Well, I was short of funds, that is true.

Q. You were aware that you should be filing, is that true?

A. Well, certainly. I was aware that I should be filing. I didn't know—I went through—past the filing date in 1960, I think it was, and I didn't have an income or any chance of—I didn't have a job. I was drinking when I could get some money, and I just didn't file." (Tr. pp. 25–26)

On "cross-examination" by his own counsel, the taxpayer testified:

"Q. Now, did you take any steps to try to straighten out your tax affairs prior to the time the agent called upon you?

A. No.

Q. It is not a fact, sir, that you came up here with all of your documents and rented a room in a hotel across from the Revenue Service at one time?

A. That is true but I didn't take any—

(Emphasis ours.) This "factor" has only an illusory foundation in the record.

Under the leading and suggestive questions of his own counsel, Lord testified:

"Q. Do you recall now anything other than not filing a return to conceal your income or the amount of it from the Internal Revenue Service?

A. Do anything to conceal it?

Q. Yes.

A. No.

Q. Did you take commissions in cash?

A. No.

Q. When the Revenue Agent called upon you, did you tell him you had filed returns, or what did you tell him?

A. I don't remember exactly what I told him. I didn't tell him I filed any returns.

Q. You told him you had not filed returns, is that correct?

A. Yes.

Q. (Interrupting) You didn't cross the street?

A. No.

Q. What did you do all that day?

A. Sweat.

Q. Did you bring papers up here to try to straighten out your tax affairs?

A. I had a box full of things, right.

Q. And why did you come up here and—

A. (No response.)

Q. Why did you come to Seattle on that occasion?

A. I intended to get things straightened out, but I kind of lost my nerve, I guess.

Q. And why did you stay at the Town House?

A. Across the street from where the action is.

Q. That is across the street from the Revenue Service, is it not?

A. Yes.

Q. And what were you afraid of, why were you afraid to cross the street?

A. Well, I was pretty sure if I filed, and when I filed, that I would be pretty busy, maybe pounding rocks or something for being—for having failed to file. I didn't know what the penalties were, but I guessed correctly, that they would—I *might* be taken out of circulation and *maybe* out of a job." (Emphasis ours.) (Tr. pp. 33–34)

Q. You told him where you worked and where they could get the information did you not?

A. Yes." (Tr. pp. 34–35)

On redirect examination, Lord admitted that the agent interviewed him in 1967. Yet, it should be obvious from the above dialogue that Lord's answers are meaningless because the Internal Revenue Service had the Forms 1099 for a period of six years and these Forms gave his name and address, the name of his employer, and the amount of his commissions. He had no other material source of income. No returns had been filed, hence the visit by the agent.

■ Cooperation with investigating agents is certainly an element to be weighed on the issue of fraud, particularly where taxpayer's income is from many sources. In *Powell, supra*, we considered the noncooperation aspect in a case involving many different real estate transactions and held that noncooperation was an element tending to establish fraud. How the Tax Court could say that on the evidence recited above the taxpayer *cooperated fully* escapes us.

With reference to the keeping of records, which the Tax Court described as Lord's failure to maintain "adequate records" (Opin. p. 209), and previously, in its opinion, stated: "During the taxable years 1961 through 1966 petitioner did not keep adequate, complete records of business selling expenses," (Opin. p. 203), it misconstrued the evidence, for the transcript reads, under cross-examination by his own counsel:

"Q. Mr. Lord, you were furnished with 1099's that showed the amount of your commission. What was the problem in preparing your returns, if there was one?

A. In preparing it?

Q. Yes.

A. *I didn't keep very good records, you know.*

Q. You had your receipts, did you not, of what—did you not have any records?

A. Well, *I didn't have any receipts either.* I had some receipts.

Q. You had no record of your expenditures, is that correct?

A. That is about right, *except—*

MR. PATTEN: (Interrupting) No further questions, Your Honor." (Emphasis ours.) (Tr. pp. 39–40)

In addition to Lord's testimony, his former wife testified as follows:

"Q. Did you file a separate Income Tax Return?

A. Yes. I started in 1958 to file separate Income Tax Returns.

Q. Why did you start in '58 before the separation?

A. Because Bob wouldn't keep records." (Tr. p. 44)

Such testimony is hardly proof concerning the adequacy of Lord's record-keeping. To the contrary, this testimony fairly supports the inference that Lord failed to keep any business records at all for the years in question.

■ Accordingly, after our exhaustive review of the record, we are persuaded that all the evidence that the Commissioner presented clearly and convincingly establishes that the taxpayer's failure to pay his taxes was due to fraud. *Estate of Mazzoni v. Commissioner*, 451 F.2d 197, 201 (3d Cir. 1971); *Biggs v. Commissioner*, 440 F.2d 1, 5 (6th Cir. 1971); *Camien v. Commissioner*, 420 F.2d 283, 287 (8th Cir. 1970); *Estate of Upshaw v. Commissioner*, 416 F.2d 737, 741 (7th Cir. 1969), *cert. denied*, 397 U.S. 962, 90 S.Ct. 993, 25 L.Ed.2d 254 (1970); *United States v. Lease*, 346 F.2d 696, 703 (2d Cir. 1965); *Cirillo v. Commissioner*, 314 F.2d 478, 482–83 (3d Cir. 1963); *Agnellino v. Commissioner*, 302 F.2d 797, 801 (3d Cir. 1962); *Klassie v. United States*, 289 F.2d 96, 99–101 (8th Cir. 1961); *United States v. Thompson*, 279 F.2d 165, 167 (10th Cir. 1960); *Clark v. Commissioner*, 266 F.2d 698, 717 (9th Cir. 1959); *Carter v. Campbell*, 264 F.2d 930, 941 (5th Cir. 1959); *Powell v. Granquist*, 252 F.2d 56, 61 (9th Cir. 1958); *Baumgardner v. Commissioner*, 251 F.2d 311,

322 (9th Cir. 1957); *Bond v. Commissioner*, 232 F.2d 822, 826 (4th Cir.), *cert. denied*, 352 U.S. 878, 77 S.Ct. 100, 1 L.Ed.2d 79 (1956); see *Chesterfield Textile Corp. v. Commissioner*, 29 T.C. 651, 654 (1958); *Comeaux v. Commissioner*, 10 T.C. 201, 208 (1948), *aff'd sub nom. Cohen v. Commissioner*, 176 F.2d 394, 401 (10th Cir. 1949).

Judgment of the Tax Court reversed on the Commissioner's appeal and the fraud penalty reinstated.[7] Judgment is affirmed on the taxpayer's appeal.

7. The Tax Court found the taxpayer liable for additions to tax imposed by §§ 6651(a) and 6653(a) in the sum of $19,010.06. However, since we have reinstated the fraud penalty in the sum of $31,683.42, the penalties imposed by the Tax Court will be eliminated by virtue of § 6653(b) and (d).