WALTER G. HERTEL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hertel v. Commissioner
Docket No. 3385-76.
United States Tax Court
T.C. Memo 1978-345; 1978 Tax Ct. Memo LEXIS 167; 37 T.C.M. (CCH) 1431; T.C.M. (RIA) 78345; August 31, 1978, Filed George Constable, for the petitioner. Thomas N. Tomashek, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in petitioner's Federal income taxes and additions to taxes as follows: Addition to Tax Year
Deficiency
Sec. 6653(b) [1]
1969
$ 30,649.10
$ 15,324.55
1970
61,230.17
30,615.09
*168 Petitioner's income for 1969 and 1970 was reconstructed by use of the net worth method. It has been conceded by petitioner if there are any underpayments in tax they are due to fraud. [2] The only remaining issues for decision are: (1) The amount of cash petitioner had on hand at December 31, 1968, December 31, 1969, and December 31, 1970. (2) Whether the unreported income earned by petitioner during the period January 1, 1969, through December 22, 1969, constituted community property under the laws of the State of Washington. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner, Walter G. Hertel, resided in Bellevue, Wash., at the time of filing his petition herein. Petitioner, a medical doctor, and his former wife, Joean Hertel, were married in 1958 *169 and two children resulted from this marriage. In 1966 petitioner and his wife moved to the State of Washington from Maryland. In 1969 they resided in Mercer Island, Wash. Over the years petitioner's wife developed a drinking problem, which eventually led to her death in April of 1970. As a result of his wife's drinking problem, petitioner moved out of the family residence on July 1, 1969, and into an apartment by himself in Bellevue, Wash. After moving out, petitioner occasionally returned to the family residence to visit his two children. On July 3, 1969, petitioner's wife filed for divorce, which was subsequently granted on December 22, 1969. Under the terms of the decree each party was to file a separate Federal income tax return for 1969, dividing the community income equally for tax purposes. On December 31, 1968, petitioner had $ 1,100 cash on hand and on December 31, 1969, petitioner's cash on hand was zero. [3]
Respondent, in the notice of deficiency calculated increases in petitioner's net worth for 1969 and 1970 of $ 68,099.97 *170 and $ 89,759.26, respectively. Based on these increases in net worth, respondent determined petitioner understated his adjusted gross income for 1969 and 1970 in the amounts of $ 74,730.86 and $ 115,609.50, respectively. The principal source of this unreported income was the performance of illegal abortions by petitioner. OPINION The parties have stipulated that the items reflected in respondent's determination of petitioner's net worth are correct except cash on hand. [4] Therefore, the first issue we must decide is the amount of cash petitioner had on hand at December 31, 1968, December 31, 1969, and December 31, 1970. *171 Petitioner contends his cash on hand at December 31, 1968, was $ 149,000, the source of which was a gift of $ 200,000 cash from his father. [5]
Respondent maintains that petitioner's cash on hand was $ 1,100 at December 31, 1968, zero at December 31, 1969, and $ 10,850 at December 31, 1970. In addition, respondent argues petitioner has offered no credible evidence to support the existence of a "cash hoard" and thus failed to meet his burden of proof. With respect to petitioner's cash on hand at December 31, 1968, and December 31, 1969, we agree with respondent. At the trial of this case, petitioner testified as follows: In 1965 he visited his 92 year-old father in Germany; [6] during this visit his father, who had been a baker most of his life, gave him four envelopes containing a total of $ 200,000 in new $ 100 bills; on returning to the United States, he carried the cash through customs in his coat pockets in four envelopes each about two inches thick and told none of the customs officials about the money; he kept the money at his home in the *172 pockets of clothing in his clothes closet; on January 1, 1969, approximately $ 149,000 remained; by the end of 1971 the $ 149,000 had been spent. While this story itself is difficult to believe, its unacceptability is further enhanced by our assessment of the credibility and demeanor of the witness who presented it. Furthermore, petitioner offered no corroborating evidence to document the existence of this "cash hoard." On balance, we conclude that petitioner has failed to establish the existence of any cash in excess of that reflected in respondent's determination. Accordingly, we hold petitioner's cash on hand excluding checking accounts was $ 1,100 at December 31, 1968, and zero at December 31, 1969. However, we reject respondent's determination that petitioner had $ 10,850 cash on hand at December 31, 1970. The record shows this amount was received by petitioner in payment of two notes receivable. In the net worth computations attached to the notice of deficiency, respondent included these two notes receivable as assets of the petitioner at December 31, 1970. It is obvious that when a note receivable is *173 paid it can no longer be treated as a separate asset. Rather, it becomes cash on hand. Here, both petitioner and respondent in their briefs failed to point out to the Court the doubling effect of respondent's requested finding of fact that petitioner had $ 10,850 cash on hand at December 31, 1970. While the notes receivable were no longer assets of petitioner at December 31, 1970, they were, nevertheless, included in petitioner's net worth for 1970 because the parties stipulated to all items of petitioner's net worth for 1968, 1969, and 1970, except cash on hand. Thus, respondent's position that in addition to the notes receivable petitioner had $ 10,850 cash on hand at December 31, 1970, is erroneous. Consequently, we hold that petitioner's cash on hand at December 31, 1970, was zero. The second issue is whether the unreported income, as determined by respondent's net worth computations and earned by petitioner during the period January 1, 1969, through December 22, 1969, constituted community property under the laws of the State of Washington. If any of petitioner's 1969 income was community property, then one-half is attributable to petitioner's former wife and such portion *174 is not taxable to petitioner because he and his former wife filed separate returns for 1969. If, however, petitioner's 1969 income is his separate property, he alone is taxable on the entire amount. Petitioner argues that neither his move from the family home on July 1, 1969, nor his wife's filing of a complaint for divorce on July 3, 1969, severed their marital community, and thus income each spouse earned prior to entry of the divorce decree on December 22, 1969, remained community property. Respondent's argument is twofold. First, relying on Lord v. Commissioner,60 T.C. 199 (1973), revd. on other grounds 525 F.2d 741 (9th Cir. 1975), he argues the Hertels' marital community was severed on July 1, 1969, when petitioner moved out of the family home. Specifically, respondent contends the spouses' physical separation and subsequent filing of a divorce complaint evidence their intent to sever the marital community. Second, all of petitioner's unreported income for 1969 was earned after July 1, 1969, therefore, it was his separate income. For the reasons set forth below, we believe petitioner should prevail on this issue. Under the laws of the *175 State of Washington, with the exception of property acquired by gift, devise, or descent, all income earned or property acquired after commencement of the marital community is generally characterized as community property. See sec. 26.16.030, Wash. Rev. Code. However, as we stated in Lord v. Commissioner,supra, at 206, "a marital community that has not been legally dissolved may still be considered to have been terminated under Washington community property law if both spouses have acted in a manner that clearly demonstrates that they have mutually renounced the marital relationship." See In re Estate of Nikiporez,19 Wash. App. 231, 574 P.2d 1204, 1208 (1978); In re Estate of Osicka,1 Wash. App. 277, 461 P.2d 585, 588 (1969); Rustad v. Rustad,61 Wash.2d 176, 377 P.2d 414, 416 (1963); MacKenzie v. Sellner,58 Wash.2d 101, 361 P.2d 165, 167 (1961). Essentially, the factual question of whether a husband and wife have severed the marital relationship can only be determined from a careful examination of the surrounding facts and circumstances. See Lord v. Commissioner, supra, at 207; *176 Togliatti v. Robertson,29 Wash.2d 844, 190 P.2d 575, 579 (1948). We do not believe the facts in the instant case support respondent's contention that the Hertels intended to sever their marital community prior to the entry of the divorce decree on December 22, 1969. While petitioner did move out of the family home on July 1, 1969, separation alone does not dissolve the community even though divorce may follow later. Kerr v. Cochran,65 Wash.2d 211, 396 P.2d 642, 650 (1964). Moreover, the mere filing of a divorce complaint by one spouse is also insufficient to sever the marital community. In support of his position that the Hertels' marital community was severed on July 1, 1969, respondent relies on Lord v. Commissioner,supra. We believe respondent's reliance on Lord is misplaced. In Lord, the petitioner moved from the family residence in Iowa to the State of Washington in early 1960. After five years of separation, his wife was granted a divorce. One of the issues was whether any of petitioner's income earned while he was in Washington was community property. This Court found that during the years of separation, *177 petitioner and his wife made no effort to contact each other and after his departure petitioner provided no support for either his wife or children. Moreover, while in Washington petitioner maintained a continuing relationship with another woman. On these facts, we concluded in Lord that the lack of interest displayed by the petitioner and his former wife toward each other clearly demonstrated their marriage was substantively dead. We, therefore, held the parties' marital community was severed in 1962 when petitioner became a domicile of Washington, and thus all of petitioner's income earned beginning in 1962 was his separate property. In sharp contrast to the facts in Lord, in the instant case petitioner, upon leaving the family residence, simply moved into an apartment by himself in another part of town and continued to see his wife and children. Furthermore, the interval between the Hertels' separation and the entry of the divorce decree was only five months, while in Lord the interval between the parties' separation and the severance of their marital community was two years. In light of the continued communications between petitioner and his wife, the close *178 proximity of their respective residences during the period of separation, and the short duration of the separation period prior to their divorce, we do not believe that petitioner and his wife acted in such a manner to warrant a conclusion that their marital community was severed on July 1, 1969. [7]
*179 Finally, it should be noted the divorce decree ordered each party to file a separate Federal income tax return for 1969, dividing the community income equally. While not free from doubt, we are of the opinion that this provision indicates the superior court believed the marital community survived until the date of the decree. Thus, we hold that the Hertels' marital community was not severed until the final decree of divorce was entered on December 22, 1969. Consequently, the unreported income earned by petitioner between January 1, 1969, and December 22, 1969, is community property. [8]
*180 Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, and in force during the Years in issue.↩
2. Petitioner was convicted in 1975 of income tax evasion for the years 1969 and 1970 under sec. 7201. Petitioner's concession makes unnecessary a consideration of whether any deficiencies are barred by the statute of limitations. See sec. 6501(c)(1).↩
3. These figures exclude the balances in petitioner's checking accounts, which amounts have been stipulated to by the parties.↩
4. In a supplemental stipulation, the parties agreed that on December 31, 1968, petitioner and his former wife had a cost basis in residential furnishings 1nd landscaping of $ 7,049.69 that was not included in the computation of net worth attached to the notice of deficiency. Such an increase in petitioner's 1969 opening net worth would result in a decrease in the unreported income for 1969 if his 1969 closing net worth was not correspondingly increased. Respondent contends that as a result of the division of property pursuant to the Hertels' marital dissolution, petitioner incurred a $ 6,691.89 nondeductible personal loss which should be added to petitioner's closing net worth for 1969. The effect of this adjustment, respondent contends, is to increase petitioner's 1969 unreported income and thereby offset the reduction in such unreported income caused by the $ 7,049.69 increase in petitioner's 1969 opening net worth. While petitioner's 1969 opening net worth must be increased by $ 7,049.69, we reject respondent's proposed $ 6,691.89 increase in petitioner's closing net worth for 1969. To begin with, respondent based his computation of the proposed loss on the assumption that the Hertels' marital community was severed on July 1, 1969. Since we hold that such community was not severed until December 22, 1969, respondent's computation is incorrect. Moreover, the table submitted by respondent which purports to show petitioner's gains and losses on the property settlement with his wife is not only incomprehensible but also internally inconsistent. Petitioner's transfer of his share of the personal residence (an asset) to his wife is treated as a loss to him. However, petitioner's transfer of his share of a note payable (a liability) to his wife is also treated as a loss to him. Both cannot be correct.↩
5. Petitioner's brief does not indicate what he contends his cash on hand was at December 31, 1969, and December 31, 1970.↩
6. The record shows petitioner traveled to Germany in 1965.↩
7. Based on the evidence submitted by petitioner, we are satisfied the marital community survived until December 22, 1969. Respondent does not contend nor is there any evidence to support the contention that the Hertels entered into a property settlement after their separation or that an interlocutory divorce decree was issued. If either of these events had occurred, then under Washington case law a severance of the marital community could have resulted. See In re Estate of Osicka,1 Wash. App. 277, 461 P.2d 585, 588 (1969); MacKenzie v. Sellner,58 Wash.2d 101, 361 P.2d 165, 167 (1961); In re Janssen's Estate,56 Wash.2d 150, 351 P.2d 510, 512 (1960); In re Armstrong's Estate,33 Wash.2d 118, 204 P.2d 500, 504 (1949); Togliatti v. Robertson,29 Wash.2d 844, 190 P.2d 575, 578 (1948). See also Rev. Rul. 68-66, 1968-1 C.B. 33↩, which seems to factually support petitioner's position herein.
8. We reject respondent's contention that all of petitioner's unreported income for 1969 was earned after July 1, 1969, because there is sufficient evidence in the record to indicate petitioner was generating income from his private practice and from the performance of abortions during the entire year and not just after July 1st. The former wife's share of petitioner's 1969 unreported income should be computed on a pro rata basis using a fraction, the numerator of which should be the number of days from January 1, 1969, through December 22, 1969, and the denominator of which should be 365.↩