WILLIAM GELLER and DORIS GELLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Geller v. Comm'r
Docket No. 4046-73. United States Tax Court
T.C. Memo 1976-257; 1976 Tax Ct. Memo LEXIS 146; 35 T.C.M. (CCH) 1122; T.C.M. (RIA) 760257; August 18, 1976, Filed William Geller, pro se. Gordon W. Cook and Larry Kars, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent determined deficiencies in the *147 Federal income taxes and additions to the tax due from the petitioners as follows: Addition to
the tax, section Year
Deficiency
6653(b) [1]
1965
$111,123.57
$55,561.79
1966
5,598.89
2,799.45
The issues remaining for decision are as follows: (1) Whether petitioners received unreported income in taxable years 1965 and 1966 in the amounts of $203,612.78 and $24,151.25, respectively. (2) Whether any part of the underpayment of taxes by Dr. William Geller [2] for taxable years 1965 and 1966 is due to fraud. FINDINGS OF FACT The parties have been unable to agree to a stipulation of facts.However, the authenticity of various documents was stipulated at trial. The exhibits so stipulated are incorporated herein by this reference. Dr. William *148 Geller and Doris Geller filed joint Federal income tax returns for 1965 and 1966 with the District Director of Internal Revenue, Manhattan, New York. At the time the petition in this case was filed, petitioners resided in New York, New York. In February 1958, petitioner was indicted for income tax evasion. He pleaded guilty to the charges for taxable years 1953 and 1954. In July 1963 and in September 1964, petitioner offered to compromise the Federal income tax liabilities which at that time were $170,414.67, plus interest. In support of the 1974 offer, he filed statements of financial condition (Form 433) with the respondent which indicated that he had assets worth $650.00 and liabilities, not including Federal income taxes, of $30,000. He did not have sufficient income to necessitate the filing of Federal income tax returns for 1956 through 1963, inclusive. During 1965 and 1966, petitioner was a practicing medical doctor. His office was located at 135 Ridge Street, New York, New York. Petitioner, his wife Doris, and his sister Regina Strasfeld incorporated the 2377 Creston Corporation (hereinafter sometimes referred to as the corporation) on December 28, 1950. The *149 same three individuals were named in the certificate of incorporation as directors. The address of the corporation was listed as 135 Ridge Street, New York, New York, which is the same address as that given for petitioner and his wife. The 2377 Creston Corporation engaged in a real estate business. It owned a building which it sold prior to 1965 at a profit. It reported gain from the sale on the installment method. Thereafter, it engaged in securities trading. In its corporation income tax return filed for calendar year 1965, the corporation reported income from the installment sale of a building in the amount of $117,184.19. It reported taxable income of $70,859.70 before the dividends received deduction. The address shown on the return was c/o Geller, 135 Ridge Street, New York, New York. The return was signed by William Geller as president. In its corporation income tax return filed for calendar year 1966, the corporation reported no installment income. It reported a taxable loss of $10,224.09. The address shown on the return was c/o Geller, 135 Ridge Street, New York, New York. The return was signed by William Geller as president. The corporation income tax *150 returns for 1965 and 1966, were prepared by Mason S. Greenland, an accountant, from figures supplied by petitioner. No books of original entry were provided by the petitioner. Income and expenses were totaled before the information was given to Mr. Greenland for use in the preparation of the return. The balance sheets of the corporation as shown on its tax returns for 1965 and 1966 were as follows: Assets
12/31/64
12/31/65
12/31/66
Cash
$242,622.70
$ 12,128.48 $
Notes and accounts
receivable
143,058.73
172,112.42
145,227.20
Other investments
85,120.93
44,987.90
Other assets
930.24
Total assets
$471,732.60
$229,228.80
$145,227.20
Liabilities and Capital
Long term mortgages
and notes
$210,072.86
$ 52,282.86 $
Common stock
5,000.00
5,000.00
5,000.00
Surplus reserves
143,592.24
Earned surplus
113,067.50
171,945.94
140,227.20
Total liabilities and
capital
$471,732.60
$229,228.80
$145,227.20
The change in the earned surplus figure on the balance sheet for 1965 was explained in the return as follows: Balance at beginning of year
$113,067.50
Net income per books
71,789.94
Total surplus available
$184,857.44
Less: Distributions
Federal income taxes
for 1964
12,911.50
Balance at end of year
$171,945.94
*151 There was no accounting in the return for the reduction in "surplus reserves" from $143,592.24 to zero. The corporation income tax return for 1965 shows that two officers were compensated during the year.Murray L. Geller, petitioner's son who was 24 years old in 1965, was listed as secretary at a salary of $7,000. Irwin (also known as "Irving" or "Isaac") Geller, petitioner's son who was 21 years old in 1965, was listed as president at a salary of $5,200. No compensation of officers was shown in the 1966 return. The 2377 Creston Corporation maintained a number of savings accounts during 1965. Petitoner had the autohority to withdraw such funds on his signature. During July 1965, the following checks made payable to William Geller were drawn on corporate savings accounts: Savings Institution
Date
Amount
West Side Federal Savings & Loan
Association
7/27/65
$ 2,501.34
Knickerbocker Federal Savings
& Loan Association
7/27/65
7,500.00
Knickerbocker Federal Savings
& Loan Association
7/30/65
3,084.18
Queens County Federal Savings
& Loan Association
7/30/65
1,981.67
Total
$15,067.19 Each of the checks carried the endorsement *152 of William Geller, followed by that of "Wolf Geller." They were also endorsed by the brokerage firm of Merrill Lynch, Pierce, Fenner & Smith. On June 17, 1965, petitioner personally opened a brokerage account with the firm of Merrill Lynch, Pierce, Fenner & Smith (hereinafter referred to as "Merrill Lynch") in the name of "Wolf Geller." The account executive at Merrill Lynch filled out a new account card on the basis of information furnished by petitioner when the account was opened. The address listed for the account was 318 East 149th Street, Bronx, New York, which was the business address of petitioner's brother, Morris Geller. The card listed petitioner's net worth at $150,000.
According to Merrill Lynch's deposit sheets, petitioner made deposits of $203,612.78 to the account during 1965 and $24,151.25 during 1966. Among the deposits were the four checks representing withdrawals from the 2377 Creston Corporation savings accounts in July 1965 and totalling $15,067.19. Bonds with a total cost of $203,992.38 in 1965 and $24,151.25 in 1966 were purchased for the account. The bonds purchased were New York City Housing Authority and New York State Dormitory Revenue bonds in *153 bearer form with coupons attached. Interest from such bonds is tax-exempt. On at least six occasions, the bonds were hand-delivered to Dr. Geller, who was usually accompanied by a young man. None of the bonds were resold through the Merrill Lynch account. In his Federal income tax returns for 1965 and 1966, petitioner reported taxable income of $610.00 and $3,092.15, respectively. His income from the practice of medicine was reported as follows: 1965
1966
Gross receipts
$2,881.50
$4,951.00
Business deductions
- 2,899.18
1,858.85
Gross profit
0
$3,092.15 Petitioner reported no dividend income in 1965 or 1966. The returns were prepared by Mason Greenland from figures supplied by petitioner. No records were kept by petitioner to show the source or disposition of deposits to the Merrill Lynch account. Respondent determined that petitioner understated his income for the years 1965 and 1966 by $203,612.78 and $24,151.25, respectively. After adjusting for other deductions, respondent determined that petitioner's additional tax liabilities for 1965 and 1966 were $111,123.57 and $5,598.89, with additions to the tax imposed by section 6653(b) *154 of $55,561.79 and $2,799.45, respectively. The liability of Doris Geller was limited to the deficiencies computed without the additions to the tax imposed by section 6653(b). On February 15, 1968, petitioner gave a sworn affidavit to the respondent. According to the affidavit, petitioner stated: To my knowledge this corporation (2377 Creston Corp) does not do any business as of now. * * * [The] accountant was Albert Podrid. He did have important papers and records for this Corporation. During 1967, I asked him for the records. He told me that he destroyed them. It is my openion [sic] that he does have them but refused to give them to me. I did sign the income tax returns for this corporation. I have no knowledge was [sic] has happened to the Corporate assets. I do not have the information or records to complete the financial statement for the Corporation (Form 433-AB). On March 5, 1969, respondent's agents conferred with petitioner in connection with an inquiry into the tax liability of the 2377 Creston Corporation. According to a memorandum of the conference prepared by the agents on the date of the conference, petitioner claimed he did not understand his *155 constitutional rights, as he was under the influence of drugs which he took regularly for his bad heart. In reply to most of the questions asked him, petitioner replied that he did not know or did not remember. According to the memorandum, he claimed merely to be an employee of the corporation, and he did not know who his employer was. On subsequent occasions, petitioner refused to meet with respondent's agents in connection with an inquiry into his individual tax liability. ULTIMATE FINDINGS OF FACT Petitioner received income of $203,612.78 in 1965 and $24,151.25 in 1966 which he failed to report on his tax returns filed for those years. Petitioner fraudulently omitted income on his 1965 and 1966 Federal income tax returns with an intent to evade tax. OPINION Petitioner is a medical doctor who, having failed to pay a large assessment for overdue taxes, filed a statement with the respondent in 1964 showing his net worth to be negative. He reported taxable income for 1965 and 1966 in the amounts of $610.00 and $3,092.15, respectively. On June 17, 1965, he opened a brokerage account with Merrill Lynch under the name of Wolf Geller. During 1965 and 1966, he purchased *156 $203,612.78 and $24,151.25, respectively, worth of tax-exempt bearer bonds through the account. Petitioner took delivery of the bonds, picking up most of them personally, and did not resell any of the bonds through the account. Petitioner, his wife and his sister incorporated the 2377 Creston Corporation in 1950. The address of the corporation was, during 1950 and at all times relevant herein, in care of Geller at the office address of petitioner. Petitioner signed the corporation income tax returns for 1965 and 1966 as president. Petitioner's sons received compensation as officers of the corporation in 1965. The corporation returns for 1965 and 1966 showed reductions in cash on hand of $230,494.22 and $12,128.48, respectively. A reduction of $143,592.24 in "surplus reserves" in 1965 was not explained on the return. Petitioner withdrew $15,067.19 from the corporation's savings accounts in 1965, and deposited the amounts in his account with Merrill Lynch. Respondent determined that the unexplained deposits in the brokerage account with Merrill Lynch were unreported income taxable to petitioner.Respondent contends that a likely source of those funds was the 2377 Creston *157 Corporation, distributions from which were taxable as dividends to petitioner. Respondent further contends that the failure to report such income was due to fraud with intent to evade tax, so that (1) deficiencies for the years in question are not barred by the statute of limitations, and (2) the 50 percent addition to tax may be assessed under section 6653(b). [3]
Respondent's determination that the unexplained deposits were income was not arbitrary. Petitioner failed to cooperate with respondent's agents and did not present any explanation of his deposits. Initially, he denied having made them. In *158 view of the absence of books and the inadequacy of petitioner's explanation of the deposits, respondent was fully justified in resorting to the bank deposits method of reconstructing income. John Harper,54 T.C. 1121, 1129 (1970). "A petitioner cannot refuse to cooperate with the agent conducting a tax investigation and then claim that the resulting determination by the Commissioner was arbitrary when the agent acted reasonably, taking into consideration the information available to him." Estate of Mary Mason,64 T.C. 651, 658 (1975). Inasmuch as respondent's determination is supported by the evidence and is neither arbitrary nor unreasonable, then a presumption of correctness attaches to the determination. Estate of Dorothy E. Beck,56 T.C. 297, 340 (1971); John Harper,supra.
With respect to the issue of fraud, however, the burden of proof is on the respondent, and such proof must be clear and convincing. Section 7454(a); Kreps v. Commissioner,351 F.2d 1 (2d Cir. 1965), affg. 42 T.C. 660 (1964); Rule 142, Tax Court Rules of Practice and Procedure. Whether fraud exists is a question of *159 fact to be determined upon consideration of the entire record. M. Rea Gano,19 B.T.A. 518 (1930). The mere understatement of income is not enough to establish fraud, because the intent of the taxpayer to evade taxes must be affirmatively established. Drieborg v. Commissioner,225 F.2d 216, 218 (6th Cir. 1955). However, fraud need only be shown with respect to a part of the deficiency. Section 6653(b). Petitioner makes a multitude of arguments. He contends that the assessment cannot be made because it is barred by the statute of limitations, or, alternatively, laches. He contends that he was not adequately notified of the basis for respondent's determination and thus was not afforded his right to due process of law under the Fifth Amendment to the Constitution. He claims that the respondent illegally opened his mail and withheld evidence helpful to his case, preventing him from obtaining a fair trial. He challenges the admissibility of Merrill Lynch's deposit sheets. Petitioner relies on the statute of limitations to bar the assessment of tax. However, respondent contends that petitioner filed false and fraudulent returns and willfully attempted *160 to evade tax for the years in question so that section 6501(c)(1) applies to keep open the period of assessment. [4] The resolution of this issue thus depends upon whether the petitioner filed a fraudulent return with intent to evade tax, which the respondent has the burden of proving by clear and convincing evidence. Section 7454(a); Rule 142, Tax Court Rules of Practice and Procedure.
*161 Nor may petitioner avail himself of the doctrine of laches in the event that the statute of limitations does not bar the assessment. Laches is no defense against the United States. United States v. Summerlin,310 U.S. 414, 416 (1940). Respondent cannot be barred from prosecuting a tax claim because of laches. Olshausen v. Commissioner,273 F.2d 23, 28 (9th Cir. 1959). Petitioner contends that his Fifth Amendment rights were violated, inasmuch as he was not given notice of the basis for the deficiencies in his tax until immediately prior to the trial. He relies primarily on the fact that he was not put on notice that the disappearance of funds from the 2377 Creston Corporation was to be used by respondent as a plausible source of funds for his deposits in the brokerage account. This argument ignores the fact that the basis for the assessment was petitioner's making large unexplained deposits to a brokerage account which he had opened. Petitioner was adequately apprised of this fact by the notice of deficiency, which stated in part: It is determined that you realized unreported taxable income in the amount of $203,612.78 for the taxable year *162 1965 and $24,151.25 for the taxable year 1966 representing unexplained deposits in the brokerage account of Wolf Geller with Merrill, Lynch, Pierce, Fenner & Smith, Inc. of (sic) which were not verified or explained. The notice of deficiency clearly indicates the amounts and dates of the purported income and the reason for arriving at those amounts.[5] Respondent's subsequent declaration of a potential source of the funds deposited does not alter the fact that petitioner was informed of the basis for the determination, namely the unexplained deposits, far in advance of the time of trial. He had ample opportunity to show that the funds could have been derived from a nontaxable source. Petitioner contends that the respondent illegally intercepted and opened his mail and that as a result the case should be dismissed or evidence excluded as "fruit of the poisoned tree." At trial, however, petitioner was unable to point to any evidence which was obtained through illegal acts.Nor was he able to find any connection between the illegal acts and the evidence *163 relied on by respondent. There is thus no evidence upon which the exclusionary rule may operate.Petitioner's remedy for this alleged violation of his civil rights is not in this Court. Petitioner claims that the respondent withheld evidence helpful to his case. He points to alleged interviews that respondent's agents had with his brother Morris in which Morris "told the entire truth." Morris is now deceased, and petitioner claims he is prejudiced by not having a record of Morris' statements made available to him.Respondent's agent testified that Morris was "not responsive" and that no evidence was obtained from him. When summoned by the respondent, Morris did not appear on the appointed date. In a letter to respondent, he denied knowledge of security transactions made with or for the petitioner.This evasive response lends credence to the agent's characterization of Morris. We choose to believe respondent's agent. On brief petitioner objects to the admission of the Merrill Lynch records. Since they were transcribed by humans, he says, they could have been in error. Further the name listed on the deposit sheets is "W. Geller," of which there are several in New York. Petitioner *164 contends that this does not prove that the deposits were to his account. Petitioner's argument overlooks the fact that the deposit sheets also carry the account number, which is unique to petitioner. With respect to admissibility, it is clear that business records may be admitted into evidence as an exception to the hearsay rule, provided they are kept in the regular course of business as indicated by the testimony of a person charged with their custody. [6] As to the weight to be accorded the documents, we regard the deposit sheet compilation of petitioner's deposits to be accurate, inasmuch as the figures thereon comport with the other evidence admitted in this case. *165 The only affirmative explanation petitioner offers of his activities is that he acted solely as the agent of his mentally retarded brother Morris, whom he felt an obligation to help. Morris, in turn, was supposedly the dupe of a "Mr. Klein." Morris is now deceased, and petitioner did not produce Mr. Klein at trial. Petitioner's testimony and his allegations at trial and on brief are replete with self-contradictions and are unworthy of belief. On repeated occasions, petitioner maintained a position until confronted with contrary evidence, at which time he took a new position inconsistent with the old. The disparities in petitioner's allegations may be illustrated by his contentions regarding the brokerage account with Merrill Lynch. In his petition to this Court, petitioner stated that respondent erred in determining the deficiencies in the following respect: "I, William Geller, am not Wolf Geller." By making such a statement, petitioner intended to deny that he had made deposits to the brokerage account in the name of Wolf Geller, as alleged in the notice of deficiency. Confronted with cancelled checks which bore the endorsements of petitioner, "Wolf Geller" and Merrill *166 Lynch, petitioner admitted at trial that he had opened the brokerage account with Merrill Lynch, in the name of Wolf Geller. He claimed that Wolf Geller was not a fictitious name, but rather his Hebrew name. [7] He also stated that the account was not for his benefit, but for that of his brother Morris. As evidence of this assertion, he pointed to the address given for the account, which was the business address of his brother Morris. In explanation of the statement in the petition, petitioner maintained that the petition was in fact drafted and written by his wife Doris, who was not familiar with the fact that Wolf Geller was his Hebrew name. Petitioner's explanation is not worthy of belief. Petitioner, not his wife, was the active member in the family's legal and financial dealings. The petition bears his signature. Further, there was no reason for the reference to "Wolf Geller" other than response to the allegation in the notice of deficiency. It is also hard to believe that petitioner's wife would not *167 be familiar with his Hebrew name, if Wolf Geller were in fact his Hebrew name. Petitioner contends that he never personally picked up the bearer bond certificates purchased through his brokerage account. He maintained at trial that the certificates were sent through the mail to the address listed for the account, which was that of his brother Morris. We have found as a fact that petitioner personally took delivery of the bearer bonds purchased through his brokerage account. His account executive at Merrill Lynch at the time, Marvin Brown, testified that the petitioner personally opened the account. Thereafter, petitioner telephoned Mr. Brown with instructions to purchase bonds. Deposits were made to cover the purchase. When the bond certificates were ready, petitioner, who was accompanied by a young man, went to the Merrill Lynch office and met Mr. Brown who led him to the cashier. [8] Mr. Brown testified that this took place on six or seven occasions and that he did not recall the certificate being mailed on any occasion. *168 Petitioner contended at trial that Mr. Brown did not remain at the cashier's window to witness the entire transaction, while Mr. Brown maintained that he saw the certificates being delivered to petitioner. Regardless of whether petitioner was correct in his contention that Mr. Brown did not actually see the delivery of the bonds, it is clear from Merrill Lynch's records for petitioner's account that the certificates were in fact delivered. The evidence, albeit circumstantial, is overwhelming that petitioner took personal delivery of the bonds. Circumstantial evidence may be relied upon to prove fraud. Robert P. Lord,60 T.C. 199, 208 (1973), revd. in part and affd. in part 525 F.2d 741 (9th Cir. 1975); Nathaniel M. Stone,56 T.C. 213, 224 (1971); Tsuneo Otsuki,53 T.C. 96 (1969). In his reply brief, petitioner changed his story once again, apparently claiming that the young man who accompanied him when he called for the bonds at the Merrill Lynch office was his brother Morris. Petitioner indicated that the bonds were delivered to Morris and that he merely accompanied Morris because the latter was sick. He stated *169 in the brief, "I was afraid that he may die on the road or in the subway with the bonds. That is the reason I went with him." Once again petitioner is belatedly attempting to conform his story to the facts. However, the young man who accompanied petitioner at the brokerage office was described by Mr. Brown as probably being in his teens. While Morris is apparently younger than petitioner, petitioner's own statement indicates that Morris was in his middle 30's at the time. It is doubtful that Morris was in fact the young man who accompanied petitioner, but regardless of whether this was the case, it is clear from the testimony of Mr. Brown that petitioner, not the young man, controlled the transactions. Petitioner pleads ignorance with regard to the affairs of the 2377 Creston Corporation. In a sworn affidavit given February 15, 1968, he stated that he had no knowledge of what happened to the assets of the corporation. Confronted with the cancelled checks representing withdrawals from savings accounts of the corporation, petitioner claimed that he received a salary from the corporation which he had reported as income. He also stated that he did not have any knowledge of *170 who controlled the corporation, since he only served as an employee of the corporation. Petitioner's testimony must be rejected as false. Petitioner was an original incorporator and shareholder of the corporation, along with other members of his family. During the years in question, petitioner signed the income tax returns of the corporation as president.The returns were sent to his address. They were prepared by an accountant at his direction. During 1965 his two young sons were salaried officers, yet petitioner was unable to name any services which they performed for the corporation. Petitioner had the right to withdraw money from the corporation's savings accounts on his signature alone. The only other person with such a power was his wife. Furthermore, he did not report any income from his alleged "salary." The evidence is abundant that petitioner was intimately involved with the corporation during the years in question and that he, in fact, controlled the corporation. Aside from the fact that petitioner's testimony was unworthy of belief, the record contains numerous instances of affirmative evidence that petitioner's activities were conducted with fraudulent intent. *171 Petitioner attempted to conceal his deposits to the brokerage account. See Spies v. United States,317 U.S. 492, 499 (1943). He opened the account in a name other than the one which he normally used. See Estate of Dorothy E. Beck,supra, at 366. He made deposits to this account from sources which he was unable or unwilling to identify, having kept no records of the transactions. See Tsuneo Otsuki,supra, at 109. Through the account, he purchased tax-exempt bonds in bearer form, which were readily transferrable and on which no interest payments were required to be reported for tax purposes. Petitioner's activities had other indicia of fraud. He failed to cooperate with revenue agents sent to investigate his tax liability and that of the corporation. See Estate of Dorothy E. Beck,supra, at 365. He made statements inconsistent with the facts and with his own previous statements. See Lillian Pascarelli,55 T.C. 1082, 1093 (1971); Lillian Kilpatrick,22 T.C. 446, 456 (1954). Nor can petitioner be said to be ignorant of the internal revenue laws. His past dealings *172 with respondent have been extensive. See Estate of Dorothy E. Beck,supra, at 368. In view of the foregoing, the conclusion is inescapable that petitioner fraudulently understated his income with the intention of evading taxes. Accordingly, the statute of limitations does not bar the assessment, and the petitioner is liable for the addition to tax under section 6653(b). Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Doris Geller is a petitioner herein solely by reason of having filed joint returns with her husband. Hereinafter, references to "petitioner" are to Dr. William Geller. The respondent has conceded that Doris Geller is not liable for any addition to the tax for fraud.↩
3. SEC. 6653. FAILURE TO PAY TAX. * * *
(b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. * * *↩
4. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule.--Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. * * *
(c) Exceptions.-- (1) False return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. (2) Willful attempt to evade tax.--In case of a willful attempt in any manner to defeat or evade tax imposed by this title (other than tax imposed by subtitle A or B), the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time. * * *↩
5. The notice was timely and was sent to petitioner's last known address. The requirements of section 6212 were thus satisfied.↩
6. Rule 803 of the Federal Rules of Evidence provides as follows: Rule 803. Hearsay Exceptions; Availability of Declarant Immaterial The following are not excluded by the hearsay rule, even though the declarant is available as a witness: * * *
(6) Records of regularly conducted activity.--A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit. * * *↩
7. In a sworn affidavit, petitioner's brother, Solomon Geller, stated that petitioner's Jewish name was Welvel. He had never known petitioner to use the name "Wolf."↩
8. Petitioner also contended at one time that it was his brother Morris who telephoned Mr. Brown and who arrived at the Merrill Lynch office to pick up the bond certificates. He explained his identification by Mr. Brown, the account executive, by saying that he and Morris looked very much alike and that Mr. Brown may have mistaken Morris for petitioner.↩