JAMES MARCUS WHITLER, JR.,Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Whitler v. Commissioner
Docket No. 9793-77.
United States Tax Court
T.C. Memo 1980-214; 1980 Tax Ct. Memo LEXIS 375; 40 T.C.M. (CCH) 503; T.C.M. (RIA) 80214; June 23, 1980, filed Earle B. Fowler, for the petitioner. Robert E. Touchton, for the respondent. FAY
MEMORANDUM OPINION FAY, Judge: Respondent determined deficiencies in petitioner's Federal income taxes and additions to the tax for fraud under section 6653(b)[1] as follows: Additional
Year
Deficiency
Sec. 6653(b)
1963
$1,808.23
$ 904.11
1964
2,527.35
1,263.68
1965
2,328.52
1,164.26
1966
2,919.30
1,459.65
1967
3,649.94
1,824.97
The amounts of all of respondent's adjustments having been conceded, the only issue presented is whether any part of the deficiencies for the years 1963, 1964, 1965, *377 and 1967 was due to fraud. [2] If so, the statute of limitations will not bar assessment of the deficiencies in controversy, section 6501(c)(1), and petitioner will be liable for the 50 percent penalty for fraud under section 6653(b). All of the facts have been stipulated and are so found. At the time he filed his petition in this case, petitioner James Marcus Whitler, Jr., resided in Fairbanks, Alaska. During the years in issue, petitioner lived in Jeffersonville, Ind., which is a suburb of Louisville, Ky. Petitioner worked in Louisville as the personnel director of Spalding Laundry any Dry Cleaning Company (hereinafter Spalding) until February 1968, when his employment was terminated. Between 1961 and 1968, petitioner embezzled funds from Spalding. Petitioner caused Spalding to issue payroll checks and, in at least one instance, petty cash vouchers [3] to individuals who either no longer worked for Spalding or who never had. Petitioner converted the checks to his own use by depositing them in his account at the Bank of Sonora, Sonora, Ky. Employees Employees at the Bank of Sonora had an understanding *378 with petitioner that when they opened mail from him, they would credit to his personal account all checks received from him, including Spalding checks made payable to persons other than himself. In the years 1963 through 1967, petitioner embezzled from Spalding $4,512.27, $7,213.44, $7,563.89, $7,662.49, and $7,880.15, respectively. These figures represent the total amounts petitioner received from net payroll checks which Spalding issued to fictitious employees. Spalding itself lost more than that because Federal and local income taxes, social security taxes, and workmen's compensation and unemployment contributions were withheld from the gross amounts paid by Spalding. In 1967 petitioner directed a day porter at Spalding to remove several stacked boxes from the second floor of the Spalding plant and burn them. The boxes contained the payroll records for the years in question. Because these records were destroyed, the amounts of Federal income taxes withheld by Spalding from *379 checks issued to petitioner's fictitious employees cannot now be determined. Such taxes were paid over to respondent and have never been refunded to petitioner or anyone else. The maximum net amount paid in any one year to a fictitious employee on Spalding's payroll was $2,558.33, in 1964, but most individual yearly totals were much smaller than that. For the most part, petitioner used the funds he converted from Spalding to purchase and improve rental properties. Petitioner realized net rental income in the years 1963 through 1967 of $345.88, $173.33, $268.85, $994.01, and $2,588.23, respectively. These net rental income figures take into account such items as utility bills, taxes, insurance, repairs, and depreciation. Petitioner did not report any income from embezzlement or from his rental properties on his tax returns for the years in issue. In 1948 petitioner and his wife sold a parcel of real property located in Orlando, Fla., under a mortgage contract in their own favor calling for payments of $60 per month. Petitioner continued to receive such payments during the years 1963 through 1967 in the respective amounts of $660.00, $780.00, $783.25, $720.00, and $350.00. *380 Petitioner failed to report interest income from the sale during those years of $193.09, $199.95, $167.73, $124.70, and $48.63. Petitioner also failed to report interest income of $155.92 in 1965 and $165.00 in 1967, paid on a note by D. V. Davis. In 1966, petitioner failed to report interest income of $47.50 from a loan to Orene W. Muenninghoff. Petitioner reported no income or loss from the sale of securities on his returns filed from 1963 through 1967. In 1963, 1964, 1965, and 1967 petitioner had gross income (loss) of $1,501.99, $1,031.00, ($13.40), and $325.55, respectively, from sales of corporate stocks. These transactions were handled for petitioner by the local offices of Merrill Lynch, Pierce, Fenner & Smith Inc.
In short, on his tax returns filed between 1963 and 1967 petitioner reported no income other than his wages from Spalding, presumably as shown on his Form W-2's for those years. [4] The following table summarizes petitioner's adjusted gross income[5] between 1963 and 1967 as reported on his returns and as redetermined by respondent, broken down to show the proportions of unreported income due to embezzlement and from other activities. *381 Adjusted Gross Income
Unreported Em-
Year
Reported
bezzlement Income
1963
$8,560.00
$ 4,512.27
1964
8,820.00
7,213.44
1965
8,820.00
7,563.89
1966
9,690.00
7,662.49
1967
9,860.00
7,880.15
Other Unreported
Year
Income
Corrected
1963
$1,289.97
$14,362.24
1964
888.78
16,922.22
1965
579.10
16,962.99
1966
1,166.21
18,518.70
1967
2,964.63
20,704.79
Petitioner's embezzling was discovered in early 1968 when Spalding's assistant office manager noticed that weekly payroll checks were being issued to persons who were not enrolled in Spalding's group medical insurance plan. One thing led to another and petitioner's embezzlements and other financial transactions gradually began to come to light. A thorough examination of petitioner's bank records convinced Spalding's management that between 1961 and February 1968 petitioner had embezzled more than $40,000 in Spalding payroll checks. On February 9th, petitioner handwrote the following admission, which ended: During a period of years, I converted to my own use from Spalding checks the amount of $34,308.11 and an undetermined amount from petty cash vouchers. *382 I agree to repay this amount at the rate of $200.00 per month as long as I am able to be gainfully employed. I cannot account for any of the above mentioned funds. I have read the above and the facts are true to the best of my knowledge and belief. The next to last sentence (and thus the last as well) was untrue. This became apparent sometime later in 1968, when petitioner transferred twelve pieces of real property he had acquired with Spalding's funds between 1963 and 1967, along with two other properties, to Spalding in restitution. Petitioner's wife divorced him in June 1968, but he filed joint returns for each of the years in controversy. His wife never saw the returns because petitioner signed her name for her on all the returns except that for 1965, which was signed only by petitioner. In the returns filed for 1963 through 1965, petitioner itemized deductions; on the 1966 and 1967 returns petitioner took the standard deduction. [6] Petitioner did not maintain any records concerning misappropriated funds, rental income and expenses, interest income, or investment income, other than bank statements and cancelled checks. *383 Two of respondent's agents, Joseph R. Sandefur and J. D. Henry, Jr., interviewed petitioner in September 1968 while he was a patient at Madison State Hospital in Madison, Ind. A few weeks before, petitioner's ex-wife had had him committed after his attempted suicide by pistol at their former home. Petitioner had also been a patient at Madison State earlier that year, when he voluntarily committed himself shortly after the discovery of his embezzlements. Ott B. McAtee, the Superintendent of Madison State, made arrangements for the interview with respondent's agents. Both of respondent's agents introduced themselves as such at the beginning of the interview and explained that they were investigating possible violations of the Internal Revenue Code. Special Agent Sandefur read and explained to petitioner his rights under the Fifth Amendment to refuse to answer any questions or to submit any information he felt might incriminate him. Petitioner was further advised that any information he did provide could be used against him by the Government. He was also advised of his right to counsel and to have counsel present during this interview. Petitioner indicated that he fully understood *384 his constitutional rights and that he was willing to talk to the agents without an attorney. After the interview, petitioner signed an affidavit which summarized the major points discussed with respondent's agents. During the interview petitioner freely admitted embezzling funds from Spalding, but stated his belief that the total amount was closer to $20,000 than to $40,000. He also stated that he had prepared his own tax returns and signed his then wife's name to them without her knowledge. Petitioner admitted not reporting any income or expenses from the rental properties he had turned over to Spalding. However, petitioner denied he had ever claimed anyone but his three natural children as a dependent, denied ever loaning money in amounts over $100, and denied ever dealing in stocks through a broker. The questions asked by respondent's agents indicate that they were already familiar with petitioner's bank records. At the end of the interview, petitioner stated his belief that he was in good health and mentally competent in all respects except for feeling depressed. Petitioner was criminally indicted for income tax violations on March 13, 1970. The case was dismissed in *385 June 1974 because the Government failed to give petitioner a speedy trial. In October 1974 the Justice Department returned the case to respondent, and respondent sent petitioner the revenue agent's final report on February 10, 1975. After petitioner was twice granted extensions of time within which to file a written protest, petitioner filed a protest on May 28, 1975, and an amended protest on November 3, 1975. Two conferences were held with petitioner's representatives at the Appellate Division and petitioner filed a substituted amended protest November 10, 1976. On June 22, 1977, respondent mailed petitioner a statutory notice asserting deficiencies based on unreported income and penalties for fraud. The only issue presented is whether any part of petitioner's conceded underpayments of his income taxes for 1963, 1964, 1965, and 1967 was due to fraud with intent to evade tax. If we find fraud, the statute of limitations will not bar assessment of additional taxes for those years, section 6501(c)(1), and petitioner will be liable for the 50 percent fraud penalty under section 6653(b). *386 Stratton v. Comissioner,54 T.C. 255 (1970). As a preliminary matter, petitioner asserts that his constitutional rights were violated when he was interviewed by respondent's agents while confined as a mental patient at Madison State Hospital. Petitioner argues that because he was emotionally disturbed at the time of the interview, he could not have made a knowledgeable choice to waive his constitutional right to remain silent. Petitioner also argues that the actions of respondent's agents in questioning him under those circumstances were so outrageous as to violate the due process clause of the Fifth Amendment. Petitioner concludes that because his statements were obtained by respondent in violation of the Fifth Amendment, those statements and all other evidence respondent obtained by virtue of such statements should be excluded from this case. For the reasons below, we disagree. The facts in this case leave us far short of having to decide the constitutional issues petitioner raises. In the first place, all of the evidence upon which respondent's determination is based was independently available. Prior to the interview at Madison State Hospital, petitioner *387 had already admitted embezzling funds from Spalding and had turned over to Spalding the rental properties he had purchased with Spalding's money. During this interview, petitioner denied having other sources of unreported income, thus respondent's information about petitioner's interest income and stock sales was not developed from the interview. Because all of respondent's evidence about petitioner's true income was obtained from sources other than the interview, none of that evidence would be excludable even if petitioner's Fifth Amendment rights had been violated during the interview. Couch v. United States,409 U.S. 322, 328 (1973); Silverthorne Lumber Co. v. United States,251 U.S. 385, 392 (1920). In addition, petitioner has stipulated the truth of all of the facts and documents in this case, without reserving any rights to object to their admissibility. Parties before this Court are as a rule not permitted to withdraw or collaterally challenge their stipulations. *388 Krueger v. Commissioner,48 T.C. 824 (1967); Saigh v. Commissioner,26 T.C. 171 (1956). In this particular case, petitioner's stipulations constitute a waiver of any Fifth Amendment privileges he might have had, just as if he had himself testified in open court. United States v. Booker,363 F.2d 856 (2d Cir. 1966). See Brown v. United States,356 U.S. 148 (1958); Redfield v. United States,315 F.2d 76 (9th Cir. 1963). Petitioner's claim that respondent's activities so shock the conscience that they violate the due process clause of the Fifth Amendment, see, e.g., United States v. Payner,434 F. Supp. 113 (N.D. Ohio 1977), affd. per curiam 590 F.2d 206 (6th Cir. 1979), cert. granted 444 U.S. 822 (1979); Proesel v. Commissioner,73 T.C. 600, 607 (1979), is without merit. Visiting a mental hospital is not an illegal act, and nothing in the record indicates that respondent's agents improperly took advantage of petitioner's depressed condition. We hold that all of the evidence in this case is admissible notwithstanding any possible *389 violations of petitioner's Fifth Amendment rights. We therefore do not reach the issues decided in Brod v. Commissioner,65 T.C. 948 (1976) (evidence obtained in violation of a taxpayer's Fifth Amendment rights may be used in a civil tax case), and Schoeller v. Dunbar,423 F.2d 1183 (9th Cir. 1970) (whether a depressed mental patient who has attempted suicide may knowledgeably waive the privilege against self-incrimination is a question of fact). The primary issue is whether any part of petitioner's underpayments of taxes in each of the years in controversy was due to fraud with intent to evade tax. Fraud is an act of intentional wrongdoing with the specific purpose to evade a tax believed to be owing. Mitchell v. Commissioner,118 F.2d 308 (5th Cir. 1941). The existence of fraud is a question of fact to be determined upon consideration of the entire record. Stratton v. Commissioner,supra.Respondent has the burden of proof and must establish fraud by clear and convincing evidence. Sec. 7454(a); Imburgia v. Commissioner,22 T.C. 1002 (1954). *390 Moreover, respondent must show that some part of the underpayment of tax was due to fraud for each taxable year in issue. Ousuki v. Commissioner,53 T.C. 96 (1969). Respondent's burden may be met with circumstantial evidence. Spies v. United States,317 U.S. 492 (1943); Powell v. Granquist,252 F.2d 56 (9th Cir. 1958). Such evidence includes conduct calculated to mislead or conceal. Acker v. Commissioner,26 T.C. 107 (1956). Petitioner failed to report approximately half of his adjusted gross income in each of the years before us. Gains from embezzlement constitute reportable income, as do other accessions to wealth under the dominion and control of the taxpayer. James v. Commissioner,366 U.S 213 (1961); Commissioner v. Glenshaw Glass Co.,348 U.S. 426 (1955). Consistent substantial omissions from gross income are strong evidence of fraud. Merritt v. Commissioner,301 F.2d 484 (5th Cir. 1962); Baumgardner v. Commissioner,251 F.2d 311 (9th Cir. 1957). *391 But it is the additional "badges of fraud," considered cumulatively, which in this case overwhelmingly support respondent's determination. Petitioner has admitted embezzlement. It is a fair inference that a man who will embezzle from his employer will conceal such receipts from the Government with intent to evade taxes. McGee v. Commissioner,61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976). And while not conclusive as to the years in controversy, there can be no serious doubt about petitioner's capacity to defraud the Government since he admits falsely claiming a nonexistent personal exemption in 1966.Petitioner kept his then wife from seeing the joint returns he filed by signing her name on the returns for her. From this fact it may be inferred that petitioner realized his returns were fraudulent. When his embezzlement was first discovered by Spalding's officials, petitioner admitted taking the money but falsely denied knowing where it went. When questioned by respondent's agents at Madison *392 State Hospital, petitioner admitted he had unreported income from embezzlement and from his rental properties, but he tried to minimize the amounts involved and falsely denied having any other unreported income. These continuing attempts to conceal his true income from respondent's agents and others are very strong evidence of fraud. Lord v. Commissioner,525 F.2d 741 (9th Cir. 1975); Stone v. Commissioner,56 T.C. 231 (1971). Another "badge of fraud" is the failure to keep records. Baumgardner v. Commissioner,supra;Otsuki v. Commissioner,supra. Petitioner failed to keep any records other than his checkbook of his investment, interest, rental, and embezzlement income. Furthermore, petitioner had Spalding's records, from which his embezzlement income could have been determined, destroyed on his order. Petitioner argues that because he knew Spalding had withheld taxes from the gross amounts of the embezzled payroll checks, he might not have believed he owned any further taxes on such income. It is true that respondent must demonstrate that petitioner new or believed he was evading taxes. Stratton v. Commissioner,54 T.C. 255 (1970). *393 However, the mere existence of some withholding of taxes from unreported income is not enough to negate the inference that taxes were willfully evaded. Beaver v. Commissioner,55 T.C. 85 (1970). In this case, the amounts withheld are not known because petitioner had Spalding's records destroyed. We can only guess that the amounts involved were small, since the highest paid of petitioner's factitious "employees" netted only $2,558.33 a year--an average of less than $50 per week. [7] Petitioner's taxes were certainly higher than whatever amounts were withheld. All in all, his argument does little to rebut the other evidence in this case which shows fraud. In any event, petitioner *394 leaves completely unexplained why he failed to report income from his rental properties, interest income, and income from trading securities during the years in issue. Between 1963 and 1967 the amounts of such unreported adjusted gross income averaged $1,377.74 per year. Neither these amounts nor the variety of such income can be characterized as insubstantial. Petitioner filled out his own income tax returns, and it appears from the record that he had at least an average working knowledge of the income tax laws. He was certainly aware of the relevance of failing to report rental income, interest income, and capital gains. Based on our consideration of the entire record, we find respondent has proven fraud with intent to evade tax by clear and convincing evidence for each of the years 1963, 1964, 1965, and 1967. Petitioner raises a number of additional statutory and equitable arguments which would avoid all or part of the deficiencies and penalties determined above. These arguments need be dealt with only briefly. Petitioner argues that some credit should be given for the amounts of income taxes withheld by Spalding and paid to respondent out of the fictitious employees' *395 gross paychecks. Whatever the theoretical merits of this proposition, see generally sec. 1.31-1(a), Income Tax Regs., the argument founders for want of proof. Petitioner does not know and cannot now determine how much tax was withheld because he destroyed Spalding's payroll records for the years in question. Petitioner argues that any additional assessment is barred by respondent's laches, because the delay between the initial investigation and the examining agent's notice of proposed adjustments was unreasonable and prevented petitioner from adequately defending himself. However, because the time within which taxes may be collected is fixed by statute, respondent is not subject to the defense of laches. Saigh v. Commissioner,36 T.C. 395, 425 (1961). Moreover, in this case petitioner received adequate notice of his tax problems when he was criminally indicted, and his defense appears only to have been hampered by the facts that he had Spalding's records destroyed and kept no records of his own. Petitioner argues that his repayments to Spalding *396 in 1968 entitle him either to a net operating loss carry-back under section 172(b) or to tax credits in 1968 equivalent to deductions for the years in issue under section 1341, which applies where a taxpayer restores amounts held under a claim of right and included in an earlier year's return. However, section 172 does not apply in this case because embezzling is not "a trade or business," and section 1341 does not apply because amounts embezzled are not "held under claim of right." E.g., McKinney v. United States,38 AFTR2d 76-6098, 76-2 USTC par. 9728 (W.D. Tex. 1976), affd. 574 F.2d 1240 (5th Cir. 1978), cert. denied 439 U.S. 1072 (1979). These arguments would also fail for lack of proof, because petitioner's 1968 return is not in the record. [8]
*397 We have carefully considered all of petitioner's other arguments and find them to be meritless. Accordingly, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended.↩
2. Petitioner has conceded fraud with respect to his 1966 return.↩
3. "James Vaughn," in whose name petitioner received $1,425 in 1964 and $2,470 in each year from 1965 through 1967, was apparently paid out of petty cash by Spalding as an independent contractor.↩
4. A Form 1099 attached to petitioner's return for 1963 shows interest income received of $22.40 from a bank, but this amount was never carried over to the face of the return or included in petitioner's total income for that year. ↩
5. As defined in sec. 62.↩
6. On his 1966 return, petitioner claimed a child who did not exist as a personal exemption, and petitioner has accordingly admitted that a part of the deficiency for that year was due to fraud.↩
7. For example, in 1964, the year in which such net income of $50 per week was paid, the withholding from gross income (net plus all withheld taxes) would have been approximately $6 per week for an individual claiming one exemption, $4 for an individual claiming two exemptions, and less than $2 for an individual claiming three exemptions. [1964] 5 Stand. Fed. Tax Rep. (CCH) par. 4944. We have no way of knowing how many exemptions were claimed by petitioner's fictitious employees.↩
8. Petitioner would presumably be entitled to a deduction in 1968 for losses incurred in a transaction entered into for profit under sec. 165(c)(2). He would also be charged with income to the extent that the value of the real estate surrendered to Spalding exceeded its basis. See Fox v. Commissioner,61 T.C. 704, 713-715↩ (1974). However, 1968 is not before us.