DONALD PEPPERS AND BARBARA JEAN PEPPERS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Peppers v. Commissioner
Docket No. 9157-78.
United States Tax Court
T.C. Memo 1981-728; 1981 Tax Ct. Memo LEXIS 8; 43 T.C.M. (CCH) 160; T.C.M. (RIA) 81728; December 28, 1981. Carl J. Character, for the petitioners. John P. Graham, for the respondent. EKMAN
MEMORANDUM FINDINGS OF FACT AND OPINION EKMAN, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax for the years and in the amounts as follows: Additions to Tax
Taxable Year
Deficiencies in
Under Sec. 6653(b)
Ending
Income Tax
for Donald Peppers [1]
December 31, 1971
$ 3,491.30
$ 2,038.15
December 31, 1972
23,141.55
12,537.01
December 31, 1973
44,904.29
22,884.15
*8 The issues for our decision are (1) whether petitioners understated their taxable income and underpaid their income tax liabilities for taxable years 1971, 1972 and 1973 and (2) whether any part of the underpayment of income tax for taxable years 1971, 1972 and 1973 was due to fraud. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, the first supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. Donald Peppers and Barbara Jean Peppers, petitioners, resided in Beachwood, Ohio at the time they filed their petition herein. They filed their joint Federal income tax return for taxable year 1971 on October 3, 1973, for taxable year 1972 on September 25, 1974, and for taxable year 1973 on October 2, 1974. Donald Peppers was a practicing attorney during years 1971 through 1973 specializing in criminal law. During September 1971, Mr. Peppers organized the Quincy Avenue Money Exchange, Inc. (hereinafter Quincy Money Exchange), an Ohio corporation which engaged in a check cashing *9 business, the sale of food stamps under the Federal Food Stamp program, and other related activities. Mr. Peppers was president and manager of Quincy Money Exchange from its formation through 1973 and owned approximately 35 percent of its outstanding stock. [2]
Petitioners' business ventures during the taxable years involved herein also included the owning and racing of horses. During years 1970 through 1973 petitioners owned horses with a cost basis to them on December 31 of each year as follows: Horse
12/31/70
12/31/71
12/31/72
12/31/73
Happy Beau
$ 3,000
$ 3,333
$ 3,333
$ 3,333
Banquet Lady
2,350
2,683
2,683
2,683
Staunch Ruler
6,000
6,333
6,333
6,333
Angenora (Hy Relic)
5,000
5,000
5,000
King Gable [3]
5,000
Emulsion
2,500
2,500
Prince Stone
10,000
10,000
Money Exchange
3,700
3,700
Ma Ma Ruth
3,700
3,700
Jim's Reject
4,200
4,200
B.J.'s Don Don
2,800
2,800
Staunch Beauty
7,000
7,000
Handsome Saint
3,500
Happy Angel
1,500
Petares Scamp
3,500
Sal's Sweet Sally
3,000
Band Note
1,200
Miss Molly Magoo
3,000
Miss Tenderoni
1,700
Impressive Pet
3,000
Beaverstone
7,500
$ 11,350
$ 22,349
$ 51,249
$ 79,149
*10 During September 1972 petitioners purchased farm property known as Maple Lakes Farm apparently in connection with their horse owning and racing activities. Petitioners made improvements to Maple Lakes Farm during 1972 and 1973 with a cost basis to them of said improvements on December 31 of each year as follows: 12/31/72
12/31/73
Horse barn and track
$ 41,332.00
$ 98,549.64
Barnbars, stall gates, angle
iron, and aluminum tubing
1,361.49
Concrete
5,227.65
Lumber
733.46
1,850.34
Electric
4,880.50
Sand and gravel
12,346.40
Trenching and track grading
550.00
8,381.25
Asphalt paving
1,900.00
2,550.00
Labor and materials
1,146.00
3,346.00
$ 45,661.46
$ 138,493.27
During the taxable years involved herein petitioners also owned numerous rental properties. Petitioners acquired property at 1524 E. 123 Street, Cleveland, Ohio, on November 14, 1968, property at Quincy Avenue, Cleveland, Ohio, during 1970, property at Superior Avenue during 1970, and property at 1622 Holyrood, Cleveland, Ohio during 1972. [4] On their 1971 Federal income tax *11 return petitioners reported rents received and deducted expenses for depreciation and "other expenses" with respect to the properties at Quincy Avenue, 1524 E. 123 Street, and Superior Avenue. On their 1972 and 1973 Federal income tax returns petitioners reported rents received and deducted expenses for depreciation and "other expenses" with respect to the properties at Quincy Avenue, 1524 E. 123 Street, Superior Avenue and 1622 Holyrood. On July 13, 1977 a deed was filed with the Cuyahoga County Records recording petitioner's transfer of the Holyrood property to Nathaniel and Elizabeth Green and on November 22, 1977 a deed was filed with the Cuyahoga County Records recording petitioners' transfer of the Quincy Avenue property to GBG, Inc.[5]
*12 During the taxable years involved herein one Robert Stone made sizeable loans to Quincy Money Exchange. Notes to Mr. Stone were signed by Mr. Peppers and Ms. Green as officers of Quincy Money Exchange. The loans were substantially repaid with funds from Quincy Money Exchange. Petitioners purchased a dishwasher for $ 249.99 from Americo Wholesale Plumbing during 1972. The dishwasher was delivered to their personal residence and paid for to the extent of $ 200 by a personal check drawn by Mr. Peppers. Special agent Olcott Abbott of the Intelligence Division of the Internal Revenue Service was initially the agent assigned to petitioners' case. His first contact with petitioners occurred in late October 1974. Subsequently, Robert Milliken, a special agent for the Criminal Investigation Divison of the Internal Revenue Service who had been investigating Quincy Money Exchange, was assigned to petitioners' case. Special agent Milliken determined by means of tracing that funds were being diverted from Quincy Money Exchange to petitioners and petitioners did not report those amounts on their joint returns. Mr. Milliken also learned that petitioners had unreported gambling winnings *13 related to horse racing wagers in the amount of $ 5,000 each year for years 1971, 1972 and 1973. [6]
Petitioners reported a loss for 1971, adjusted gross income of $ 12,182.46 and taxable income of $ 7,335.09 for 1972, and a loss for 1973. In view of petitioners' inadequate books and records, respondent computed petitioners' tax liability for taxable years 1971, 1972 and 1973 using the net worth method of reconstructing income and determined that petitioners understated their adjusted gross income in the amount of $ 34,263.05 for taxable year 1971, $ 80,452.45 for taxable year 1972 and $ 125,999.87 for taxable year 1973 and their taxable income in the amount of $ 17,596.79 for taxable year 1971, in the amount of $ 80,279.82 for taxable year 1972 and in the amount of $ 108,867.55 for the taxable year 1973. The following is a summary of the net worth computations as determined by respondent: Assets
Dec. 31, 1970
Dec. 31, 1971
Cash On Hand
$ 200.00
$ 2,000.00
Cash in Banks [7]
1,271.42
905.29
Account Receivable
(John Carswell)
Automobiles [8]
22,963.60
19,258.75
Farm Equipment
Real Estate and
Improvements [9]
107,115.33
106,900.65
Horses
11,350.00
22,349.00
TOTAL
$ 142,900.35
$ 151,413.69
*14 Assets
Dec. 31, 1972
Dec. 31, 1973
Cash On Hand
$ 200.00
Cash in Banks 3,315.82
$ 688.77
Account Receivable
(John Carswell)
2,000.00
Automobiles 25,023.15
25,023.15
Farm Equipment
5,000.00
8,654.78
Real Estate and
Improvements 245,445.04
337,620.29
Horses
51,249.00
79,149.00
TOTAL
$ 330,233.01
$ 453,135.99
*15 Liabilities
Dec. 31, 1970
Dec. 31, 1971
Accounts Payable [10]
$ 2,968.72
$ 3,197.38
Notes Payable [11]
14,446.00
15,423.30
Mortgages Payable [12]
63,785.03
58,816.17
Accumulated Depreciation [13]
5,788.00
17,823.00
TOTAL
$ 86,987.75
$ 95,259.85
Liabilities
Dec. 31, 1972
Dec. 31, 1973
Accounts Payable $ 17,524.45
$ 24,303.57
Notes Payable 11,692.16
11,585.53
Mortgages Payable 140,771.48
138,709.94
Accumulated Depreciation 22,305.00
46,415.00
TOTAL
$ 192,293.09
$ 221,014.04
Increase in
Net Worth
Dec. 31, 1970
Dec. 31, 1971
Assets
$ 142,900.35
$ 151,413.69
Liabilities
86,987.75
95,259.85
Net Worth
55,912.60
56,153.84
Net Worth at Beginning
of Year
55,912.60
Increase in Net Worth
241.24
Increase in
Net Worth
Dec. 31, 1972
Dec. 31, 1973
Assets
$ 330,233.01
$ 453,135.99
Liabilities
192,293.09
221,014.04
Net Worth
137,939.92
232,121.95
Net Worth at Beginning
of Year
56,153.84
137,939.92
Increase in Net Worth
81,786.08
94,182.03
Understatement of
Adjusted Gross Income
Dec. 31, 1971
Dec. 31, 1972
Dec. 31, 1973
Increase in Net Worth
$ 241.24 $ 81,786.08
$ 94,182.03 Adjustment to Increase
in Net Worth [14]
21,555.55 10,848.83
19,685.52 Adjusted Gross Income
as Corrected
21,796.79 92,634.91
113,867.55 Adjusted Gross Income
Per Return
(12,466.26)
12,182.46
(12,132.32)
Understatement of
Adjusted Gross
Income
$ 34,263.05 $ 80,452.45
$ 125,999.87 *17 The parties by their stipulation have agreed to most of these amounts. During taxable years 1971, 1972, and 1973 petitioners did not receive any gifts, inheritances, legacies, or devises. Petitioners' two sons, Michael and Stephen, were minors under Ohio law for the taxable years involved herein. OPINION I. Understatement of Income. In view of petitioners' inadequate books and records, respondent computed petitioners' tax liability for taxable years 1971, 1972, and 1973 using the net worth method of reconstructing income and determined that petitioners understated their adjusted gross income in the amounts of $ 34,263.05 for taxable year 1971, $ 80,452.45 for taxable year 1972 and $ 125,999.87 for taxable year 1973. Petitioners do not contest respondent's right to use the net worth method as evidence of unreported income, see Lipsitz v. Commissioner, 21 T.C. 917, 931 (1954), affd. 220 F.2d 871 (4th Cir. 1955), cert. denied 350 U.S. 845 (1955), but challenge the accuracy of portions of respondent's calculations. See Holland v. United States, 348 U.S. 121 (1954). The burden is upon petitioners to show that the *18 deficiencies as determined by respondent were erroneous. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
After the parties entered into a stipulation, petitioners filed a motion to the relieved from parts of the stipulation of facts and the first supplemental stipulation of facts. Inasmuch as petitioners did not favor us with briefs, it is from that motion, in conjunction with evidence presented at trial, that we glean from petitioners their objections to respondent's net worth computations. [15]
A. Bank Accounts. Petitioners first contend that respondent erroneously included the funds from account number 28713, Quincy Savings and Loan, and account number X8714, *19 Quincy Savings and Loan, see footnote 7, supra, in the net worth computatons for the taxable years involved herein. Petitioners contend that those bank accounts were owned by their two sons, Michael and Stephen. Based upon the record, we find that petitioners have sustained their burden of proving that respondent improperly included these two small accounts in the net worth of petitioners. Mr. Peppers testified without contradiction that those accounts were trust accounts for the benefit of their two minor children. We need not rely solely on the testimony of Mr. Peppers to make such a finding, however. These accounts, containing identical amounts during the years in question, were categorized as "fiduciary accounts" on the Quincy Savings and Loan account form. Furthermore, account number 28713 was in the name of Michael Peppers and account number X8714 was in the name of Stephen Peppers, the names of the sons were placed on the signature cards in the areas designated for "Name of Beneficiary" and the address of the Peppers residence was placed in the areas on the signature cards designated for "Address of Fiduciary who will hold Passbook." The funds from these accounts *20 were not assets of petitioners to be included in their opening and closing net worths for taxable years 1970 through 1973. It is true that since Mrs. Peppers signed the signature cards she could withdraw funds from the account, but such a withdrawal would be as a fiduciary and not as the owner of the funds. Accordingly, we find that it was improper for respondent to include the funds from these fiduciary accounts in the net worth of petitioners for the taxable years involved. [16]
Petitioners next contend that respondent erroneously included in the net worth computations account number XXX-XX4995, Continental Bank, see footnote 7, supra. It is petitioners' position that this account was a trust account with Mr. Peppers acting only in a fiduciary capacity and the true owner of the funds was a client of Mr. Peppers. Again, we find petitioners have satisfied their burden. The name of the account was "Donald Peppers - (Trust Account)". Respondent's own computations listed this account as "Trust a/c". Although the record is unclear at best as to the origin *21 and purpose of this account, Mr. Peppers at trial made it clear that he never "received any benefit" from this account, which he referred to as the "attorney trust account". We note that all three accounts in dispute contained relatively small amounts for the years in queston and that petitioners do not dispute respondent's determination as to the inclusion of the eight other bank accounts in the net worth computation, or respondent's determination as to the amounts in any of the 11 accounts. Petitioners have offered logical explanations as to why these relatively minor three bank accounts were separately maintained and accordingly why these accounts should not be included in the net worth computations. In view of all the foregoing, we find that respondent's determination is to be adjusted to exclude from the net worth computations bank account numbers XXXXX, X8714, and XXX-XX4995. B. John Carswell - Account Receivable, Account Payable. Petitioners contend that the account receivable of John Carswell listed in respondent's determination for $ 2,000 as of December 31, 1973, was an account receivable due to Quincy Money Exchange and not to petitioners and therefore should be *22 excluded from the net worth computation. Petitioners also contend that the account payable to John Carswell listed in respondent's determination for $ 3,000 as of December 31, 1972, was an obligation due from Quincy Money Exchange and not from petitioners. Although at first glance a finding in petitioners' favor would appear to require a simple decrease and increase with a result that would not be beneficial to petitioners, the computations show that that is not necessarily the case. The resulting adjustment for the account receivable would simply be a lower closing net worth as of December 31, 1973, than that determined by respondent and therefore a lower increase in net worth for 1973. The resulting adjustment for the account payable would be a greater closing net worth as of December 31, 1972, than that determined by respondent and therefore a greater increase in net worth for 1972, but correspondingly, a greater beginning net worth for 1973 and therefore a lower increase in net worth for 1973 than that determined by respondent. In any event, we find that petitioners have not sustained their burden of proving that the account receivable and the account payable belonged to *23 Quincy Money Exchange. Petitioners did not submit any evidence in support of their contention; the account receivable was only briefly referred to at trial, and the account payable not referred to at all. [17] Accordingly, it was not improper for respondent to include the account receivable and the account payable of John Carswell in the net worth computation. C. Quincy Avenue Property. Petitioners contend that they were not the owners of the Quincy Avenue property during the taxable years 1971 through 1973 and therefore it should not be included in the net worth computation for those years. It is their position that the property was acquired by them during 1970 at a purchase cost of $ 35,000 but was subsequently transferred to Quincy Money Exchange as a contribution to capital. We assume petiioners are contending that they transferred the property upon the formation of Quincy Money Exchange during 1971 and therefore closing net worth for taxable years 1971, 1972, and 1973 are to be affected. *24 Initially we note that if indeed such a transfer occurred, instead of a cost basis in Quincy Avenue property of $ 35,000 in their net worth, petitioners would have a cost basis in Quincy Money Exchange of $ 35,000 in their net worth after the transfer (disregarding for the moment the impact of the mortgage and the tax escrow funds). See section 358, also see our discussion, infra, as to the mortgage on the property. Beside the initial adjustment to assets in the net worth computations, see footnote 9, supra, if petitioners did not own the Quincy Avenue property at the end of years 1971 through 1973, adjustments to respondent's computations would include a decrease in closing net worth for the tax escrow funds for the proprty, see footnote 9, supra, and increases in closing net worth for the mortgage payable, see footnote 12, supra, for the note payable for improvements to the property, see footnote 11, supra, and for accumulated depreciation, see footnote 13, supra. In any event petitioners have not sustained their burden of proving that the Quincy Avenue property was improperly included by respondent in the net worth computation. Again, petitioners offered *25 no evidence in support of their position besides their testimony. The transfer which petitioners contend occurred during 1971 was never recorded in the Cuyahoga County Records. On their Federal tax returns for years 1971, 1972, and 1973 petitioners specifically listed, and reported rents received and deducted expenses for depreciation and "other expenses" with respect to, the Quincy Avenue property. The original escrow fund and the mortgage were in the names of petitioners and the loan records through 1973 continued to reflect petitioners as the obligors of the loan. [18] Furthermore, on November 22, 1977 a deed was filed with the Cuyahoga County Records office recording the transfer of the Quincy Avenue property to GBG, Inc. by petitioners, and not Quincy Money Exchange. In view of the foregoing, we find that petitioners have not sustained their burden of showing that it was improper for respondent to include the Quincy Avenue property as an asset of petitioners during taxable years 1971 through 1973. *26 D. 1622 Holyrood Property. Petitioners contend that they were not the owners of the Holyrood property during taxable years 1972 and 1973 and therefore it should not be included in the net worth computations. Petitioners contend, in contrast to their position with respect to the Quincy Avenue property, that they never were the owners of the Holyrood property. Although the property was acquired in their names without any further notation, they insist that they acted only as agents for the true purchaser, Quincy Money Exchange. We find that petitioners again have failed to sustain their burden. Once again, petitioners offered no evidence in support of their position besides their testimony. The property was purchased in their names and there is no notation on the deed, or elsewhere in the record other than their testimony, that they were acting only as agents. Both the first and second mortgages for the property were executed in their names. [19] The mortgage loan account records continually reflected petitioners as the owners of the property for 1972 and 1973. On their Federal income tax returns for years 1972 and 1973 petitioners specifically listed, and reported rents *27 received and deducted expenses for depreciation and "other expenses" with respect to, the Holyrood property. Furthermore, on July 13, 1977 a deed was filed with the Cuyahoga County Records recording petitioners', and not Quincy Money Exchange's, transfer of the Holyrood property to Nathaniel Green and Elizabeth Green. In view of the foregoing, we find that petitioners have not sustained their burden of showing that it was improper for respondent to include the Holyrood property as an asset of petitioners during taxable years 1972 and 1973. E. Loans from Robert Stone. Petitioners contend that during the taxable years involved herein they received numerous sizeable loans from one Robert Stone. They contend that their stock was collateral for the loans and that *28 Phyllis Green signed the notes only upon the insistence of Mr. Stone's lawyer. Four notes were referred to at trial - two for $ 25,000 each, another for $ 50,000, and one for $ 20,000. We find that these loans were in fact to Quincy Money Exchange. The notes were not signed by Mr. Peppers in a personal capacity but rather as president of Quincy Money Exchange. Similarly, Phyllis Green signed the notes as an officer of Quincy Money Exchange and not as any type of guarantor; nor did she sign, as petitioners vaguely contend, as some kind of assurance that if payment were not made on the notes the stock of Quincy Money Exchange would be transferred to Mr. Stone. Amounts repaid on the loans were repaid with funds from Quincy Money Exchange. There was no written evidence of any type of collateral agreement for the loans. Furthermore, Mr. Peppers consistently represented to both special agents of respondent that these loans were loans to the corporation and were not personal in any way. Accordingly, petitioners have not sustained their burden of proving that they were the recipients of sizeable loans from Robert Stone during the years in question. F. Other contentions. Petitioners *29 contend that they are entitled to a deduction for an amount, $ 249.99, paid to Americo Wholesale Plumbing, Inc., because, they contend, it was an expense incurred "in connection with the income property". The documents entered into evidence show that the expense involved petitioners' personal purchase of a dishwasher, that the dishwasher was delivered to their personal residence and that it was paid for, to the extent of $ 200, by a personal check drawn by Mr. Peppers. Petitioners offered no evidence as to why they are entitled to this deduction and accordingly, it is denied. Section 262. Petitioners contend that they are entitled to itemize deductions. However, petitioners did not claim itemized deductions on the Federal income tax returns filed for the years involved herein and they offered no evidence as to itemized deductions. Respondent's determination that petitioners were entitled to a standard deduction in lieu of itemized deductions, accordingly, has not been shown by petitioners to be erroneous. [20]
*30 Finally, at trial petitioners attempted to discredit the tracing of funds by special agent Milliken. Petitioners' attempts in this regard were no more than attacks on isolated transactions. We have examined all the checks received in evidence and conclude that respondent properly determined by the tracing method that funds were diverted from Quincy Money Exchange to petitioners during the taxable years involved herein. [21]
II. Fraud. *31 The final issue is whether part of the underpayments in each year for taxable years 1971, 1972, and 1973 was due to fraud within the meaning of section 6653(b). Respondent has the burden of proving fraud by clear and convincing evidence. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Baumgardner v. Commissioner, 251 F.2d 311 (9th Cir. 1957), affg. a Memorandum Opinion of this Court; Miller v. Commissioner, 51 T.C. 915 (1969). The existence of fraud is a question of fact to be resolved by an examination of all the facts and circumstances. Estate of Pittard v. Commissioner, 69 T.C. 391 (1977); Stratton v. Commissioner, 54 T.C. 255 (1970). Respondent must prove for each year that some part of that year's underpayment was due to fraud. Otsuki v. Commissioner, 53 T.C. 96 (1969). "The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing". Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941). The existence of fraud with intent to evade tax must affirmatively be established *32 and fraud is not to be imputed or presumed. Otsuki v. Commissioner, supra.However, because direct evidence of fraud is seldom available, respondent's burden may be sustained with circumstantial evidence. Spies v. United States, 317 U.S. 492 (1943). The mere failure to report income is not enough to establish fraud. Merritt v. Commissioner, 301 F.2d 484 (5th Cir. 1962), affg. a Memorandum Opinion of this Court; Otsuki v. Commissioner, supra. However, the consistent and substantial understatement of income is evidence of fraud. Gromacki v. Commissioner, 361 F.2d 727 (7th Cir. 1966), affg. a Memorandum Opinion of this Court; Merritt v. Commissioner, supra; Lollis v. Commissioner, 595 F.2d 1189 (9th Cir. 1979), affg. a Memorandum Opinion of this Court; Arlette Coat Co. v. Commissioner, 14 T.C. 751 (1950). After careful examination of the entire record we find that respondent has sustained his burden of proving that part of the underpayments for each of the taxable years 1971, 1972, and 1973 was due to fraud. During the taxable years *33 involved herein petitioners consistently and substantially understated their income. A finding in favor of petitioners as to their numerous objections to respondent's net worth computations, with the exception of the alleged loans from Robert Stone, would only cause minor adjustments in the overall figures as determined by respondent and substantial understatements of income for each year would still exist. Petitioners understated their taxable income by over $ 15,000 for 1971, over $ 75,000 for 1972 and over $ 100,000 for 1973, substantial understatements especially in view of the amounts reported on their returns. See Logan v. Commissioner, 595 F.2d 365 (6th Cir. 1979), affg. a Memorandum Opinion of this Court. [22] This consistent understatement of income is evidence that some part of the underpayment for each year was due to fraud. Gromacki v. Commissioner, supra.
During 1971, 1972, and 1973 Mr. Peppers was a practicing attorney in Ohio. In *34 addition to being involved in numerous business undertakings, he was president and manager of a business which handled substantial sums of money regularly. Petitioners did not keep adequate books and records. We are convinced, in light of his education, cf. Iley v. Commissioner, 19 T.C. 631, 635 (1952), and his business experience and knowledge, cf. Powell v. Granquist, 252 F.2d 56 (9th Cir. 1958), that Mr. Peppers must have been aware that he received substantial amounts of income and that he did not, but should have, reported those amounts. Cf. Otsuki v. Commissioner, supra.
Notwithstanding petitioners' apparent cooperation with the Internal Revenue Service during most of the investigation of their income tax liability, [23] see Lord v. Commissioner, 525 F.2d 741 (9th Cir. 1975), affg. in part and revg. in part 60 T.C. 199 (1973), Powell v. Granquist, supra, we find that respondent has clearly and convincingly shown that part of the underpayments for each year 1971, 1972, and 1973 was due to fraud. We make this finding in light of Mr. Peppers' educational background, *35 his obvious experience in business undertakings and knowledge of business affairs, the lack of adequate books and records, the consistent and substantial understatement of income, and petitioners' 11th hour contention that the source of the increase in net worth was an alleged loan from one Robert Stone and not the gambling winnings which Mr. Peppers admitted to special agent Milliken were unreported and the diverted funds from Quincy Money Exchange. See Holland v. United States, supra, United States v. Massei, 355 U.S. 595 (1958). Accordingly, Mr. Peppers is liable for the addition to tax under section 6653(b). In view of the foregoing, Decision will be entered under Rule 155. Footnotes
1. Respondent does not seek to impose additions to tax under sec. 6653(b) for Barbara Jean Peppers.↩
2. Phyllis Green owned 50 percent and Dr. John Gresham owned approximately 15 percent. Ms. Green was also an officer of Quincy Money Exchange.↩
3. King Gable was sold August 1972 for $ 1,200 resulting in a business loss of $ 2,800.↩
4. A mortgage agreement was executed in the names of petitioners on the Quincy Avenue property with Quincy Avenue Savings & Loan. A first mortgage was executed in the names of petitioners on the Holyrood property with Quincy Savings & Loan and a second mortgage was executed in their names with Beachwood Mortgage Company. ↩
5. Phyllis Green signed the deed for the Quincy Avenue property for Donald Peppers under a power of attorney executed August 6, 1977.↩
6. The amounts reported in the joint returns relating to horse racing were amounts petitioners received as owners of winning horses, i.e., the purses, and not amounts received as winners of wagers.↩
7. Dec. 31, 1970
Dec. 31, 1971
Continental Bank,
Acct. # XXX-X9530
$ 535.11
$ 707.60
Continental Bank,
Acct. # X2238
Quincy Savings & Loan,
Acct. # X3986
233.10
3.92
Quincy Savings & Loan,
Acct. # X8713
52.12
54.74
Quincy Savings & Loan,
Acct. # X6851
38.39
40.31
Quincy Savings & Loan,
Acct. # X8714
52.12
54.74
Quincy Savings & Loan,
Acct. # X5417
3.49
3.49
Continental Bank, Trust
Account, XXX-XX4995
27.00
Society National Bank,
Acct. # XXX-2233
2.54
Central National Bank,
Acct. # X1814
356.55
15.49
Central National Bank,
Acct. # X0693
(2)
(2)
TOTAL
$ 1,271.42
$ 905.29
↩
Dec. 31, 1972
Dec. 31, 1973
Continental Bank,
Acct. # XXX-X9530
$ 159.35
$ 90.63
Continental Bank,
Acct. # X2238
180.75
12.71
Quincy Savings & Loan,
Acct. # X3986
3.92
3.92
Quincy Savings & Loan,
Acct. # X8713
56.09
56.09
Quincy Savings & Loan,
Acct. # X6851
41.31
41.31
Quincy Savings & Loan,
Acct. # X8714
56.09
56.09
Quincy Savings & Loan,
Acct. # X5417
3.49
3.49
Continental Bank, Trust
Account, XXX-XX4995
160.10
424.53
Society National Bank,
Acct. # 1XX-2233
Central National Bank,
Acct. # X1814
2,656.72
Central National Bank,
Acct. # X0693
(2)
TOTAL
$ 3,315.82
$ 688.77
8. 1968 Cadillac - Date
$ 7,280.00
Acquired Feb. 29, 1968
1967 Lambroghini,
Nov. 6, 1969
15,683.60
1971 Cadillac, May 10,
1971
8,800.15
1970 Mangusta-Detomaso,
May 2, 1971
10,458.60
1971 Lambroghini,
April 1, 1972
TOTAL
$ 22,963.60
$ 19,258.75
↩
1968 Cadillac - Date
Acquired Feb. 29, 1968
1967 Lambroghini,
Nov. 6, 1969
1971 Cadillac, May 10,
1971
8,800.15
8,800.15
1970 Mangusta-Detomaso,
May 2, 1971
1971 Lambroghini,
April 1, 1972
16,223.00
16,223.00
TOTAL
$ 25,023.15
$ 25,023.15
9. Beacon Drive-Residence
$ 29,900.00
$ 29,900.00
1524 E. 123 Street
3,700.00
3,700.00
Quincy Avenue property
35,000.00
35,000.00
Tax Escrow Reserve
1,282.20
1,067.52
Superior Avenue property
37,233.13
37,233.13
1622 Holyrood
Tax Escrow Reserve
Maple Lakes Farm
Tax Escrow Reserve
Improvements to Maple
Lakes Farm
TOTAL
$ 107,115.33
$ 106,900.65
↩
Beacon Drive-Residence
$ 29,900.00
$ 29,900.00
1524 E. 123 Street
3,700.00
3,700.00
Quincy Avenue property
35,000.00
35,000.00
Tax Escrow Reserve
1,275.65
709.37
Superior Avenue property
37,233.13
37,233.13
1622 Holyrood
6,200.00
6,200.00
Tax Escrow Reserve
181.60
188.92
Maple Lakes Farm
86,000.00
86,000.00
Tax Escrow Reserve
293.20
195.60
Improvements to Maple
Lakes Farm
45,661.46
138,493.27
TOTAL
$ 245,445.04
$ 337,620.29
10. Dec. 31, 1970
Dec. 31, 1971
Society National Bank
(Master Charge)
$ 449.10
$ 381.97
Continental Bank
(Master Charge)
293.42
723.27
Central National Bank
(Master Charge)
1,699.39
1,102.03
Cleveland Trust Bank
(Bank Americard)
301.81
855.11
Ohio State University
225.00
135.00
Richard Ryan
John Carswell
Ralph Coleman
Law-Barker
Scan O Vision
Brookpark Builders
TOTAL
$ 2,968.72
$ 3,197.38
↩
Dec. 31, 1972
Dec. 31, 1973
Society National Bank
(Master Charge)
$ 148.54
$ 506.84
Continental Bank
(Master Charge)
484.71
1,318.84
Central National Bank
(Master Charge)
1,105.14
1,167.93
Cleveland Trust Bank
(Bank Americard)
541.67
985.84
Ohio State University
44.39
Richard Ryan
2,200.00
600.00
John Carswell
3,000.00
Ralph Coleman
10,000.00
10,000.00
Law-Barker
3,500.00
Scan O Vision
648.78
Brookpark Builders
5,575.34
TOTAL
$ 17,524.45
$ 24,303.57
11. Dec. 31, 1970
Dec. 31, 1971
Prudential Ins. Co.
(policy loan)
$ 676.00 Prudential Ins. Co.
(policy loan)
932.00 Joseph Fader (personal
loan)
2,500.00 Quincy Savings & Loan
(property improvements)
4,576.20 3,504.80 Less Deferred Interest
(1,094.90)
(838.60)
Quincy Savings & Loan
(improvements)
1,203.75 Less Deferred Interest
(78.75)
Quincy Savings & Loan
(improvements)
2,674.92 Less Deferred Interest
(174.92)
Quincy Savings & Loan
(improvements)
535.00 Less Deferred Interest
(35.00)
Quincy Savings & Loan
(personal loan)
Less Deferred Interest
Continental Bank (loan
for taxes)
893.85 Less Deferred Interest
(58.41)
Continental Bank
3,611.79 Less Deferred Interest
(611.78)
Prudential Finance (1971
Cadillac)
3,951.25 Less Deferred Interest
(652.33)
National City Bank (1970)
Mangusta)
5,233.92 Less Deferred Interest
(1,012.00)
National City Bank (1971
Lambroghini)
Less Deferred Interest
National City Bank (1967
Lambroghini)
3,015.45 Less Deferred Interest
(496.19)
Union Commerce Bank
1,485.00 128.25 TOTAL
$ 14,446.00 $ 15,423.30 ↩
Dec. 31, 1972
Dec. 31, 1973
Prudential Ins. Co.
(policy loan)
$ 676.00 $ 676.00      Prudential Ins. Co.
(policy loan)
932.00 932.00      Joseph Fader (personal
loan)
Quincy Savings & Loan
(property improvements)
2,238.60 1,069.80      Less Deferred Interest
(535.70)
(256.10)     Quincy Savings & Loan
(improvements)
Less Deferred Interest
Quincy Savings & Loan
(improvements)
Less Deferred Interest
Quincy Savings & Loan
(improvements)
Less Deferred Interest
Quincy Savings & Loan
(personal loan)
6,107.74      Less Deferred Interest
(566.04)     Continental Bank (loan
for taxes)
Less Deferred Interest
Continental Bank
2,006.55 401.31      Less Deferred Interest
(339.86)
(67.94)     Prudential Finance (1971
Cadillac)
2,316.25 681.25      Less Deferred Interest
(390.61)
(128.89)     National City Bank (1970)
Mangusta)
Less Deferred Interest
National City Bank (1971
Lambroghini)
5,937.12 3,392.64      Less Deferred Interest
(1,148.19)
(656.19)     National City Bank (1967
Lambroghini)
Less Deferred Interest
Union Commerce Bank
TOTAL
$ 11,692.16 $ 11,585.53 [sic]
12. Dec. 31, 1970
Dec. 31, 1971
Prudential Ins. Co.
(residence)
$ 18,720.86
$ 17,880.15
Quincy Savings & Loan
(Quincy Ave. prop.)
21,102.71
20,199.49
Euclid National Bank
(Superior Ave. prop.)
23,961.46
20,736.53
Quincy Savings & Loan
(Holyrood prop.)
Quincy Savings & Loan
(Maple Lakes Farm)
Beachwood Mortgage Co.
(2nd mortgage-Holyrood
and Beacon Dr. prop.)
Less Deferred Interest
Northern Ohio Bank (Maple
Lakes Farm purchase)
TOTAL
$ 63,785.03
$ 58,816.17
↩
Dec. 31, 1972
Dec. 31, 1973
Prudential Ins. Co.
(residence)
$ 17,067.98
$ 16,134.09 Quincy Savings & Loan
(Quincy Ave. prop.)
17,904.57
16,192.84 Euclid National Bank
(Superior Ave. prop.)
17,371.19
13,670.06 Quincy Savings & Loan
(Holyrood prop.)
3,563.61
2,789.56 Quincy Savings & Loan
(Maple Lakes Farm)
46,864.13
45,267.09 Beachwood Mortgage Co.
(2nd mortgage-Holyrood
7,720.02 and Beacon Dr. prop.)
Less Deferred Interest
(1,063.72)
Northern Ohio Bank (Maple
Lakes Farm purchase)
38,000.00
38,000.00 TOTAL
$ 140,771.48
$ 138,709.94 13. Dec. 31, 1970
Dec. 31, 1971
Automobiles
$ 2,297.00
$ 7,535.00
Farm Equipment
Real Estate & Improvements
2,356.00
5,784.00
Horses
1,135.00
4,504.00
TOTAL
$ 5,788.00
$ 17,823.00
↩
Dec. 31, 1972
Dec. 31, 1973
Automobiles
$ 1,508.00
$ 3,016.00
Farm Equipment
200.00
1,065.00
Real Estate & Improvements
9,732.00
18,428.00
Horses
10,865.00
23,906.00
TOTAL
$ 22,305.00
$ 46,415.00
14. Dec. 31, 1971
Personal Living Expenses
$ 12,517.00
Income Taxes Paid
4,165.19
Nondeductible Loss on Sale of
Personal Auto
3,980.00
Nondeductible Loss on Trade-In
of Auto (10 percent personal
portion)
893.36
Nondeductible Loss on Trade-In
of Auto (10 percent personal
portion)
TOTAL
$ 21,555.55
↩
Dec. 31, 1972
Dec. 31, 1973
Personal Living Expenses
$ 10,112.97
$ 13,484.85
Income Taxes Paid
300.00
6,200.67
Nondeductible Loss on Sale of
Personal Auto
Nondeductible Loss on Trade-In
of Auto (10 percent personal
portion)
Nondeductible Loss on Trade-In
of Auto (10 percent personal
portion)
435.86
TOTAL
$ 10,848.83
$ 19,685.52
15. The parties have apparently agreed to replace those parts of the stipulaton of facts and first supplemental stipulation of facts which petitioners found objectionable with a stipulation that certain documents, including those attached to respondent's objection to petitioners' motion, are what they purport to be and, accordingly, are to be entered as exhibits in the record. In view of this agreement, petitioners' motion is deemed granted.↩
16. Sec. 6901 is available to respondent to reach assets transferred to a trust if certain requirements are met.↩
17. Petitioners failed even to submit any records of Quincy Money Exchange indicating that it was the owner of the account receivable and the obligor of the account payable.↩
18. Again, it is possible petitioners transferred the property without being relieved of the mortgage obligation but, as evidenced by their motion, petitioners contend only that they transferred the property and the loan obligation during 1971.↩
19. Petitioners stated at trial that they put the mortgage in their names because Quincy Money Exchange was a relatively new corporation at the time of the purchase of the Holyrood property. They contend, however, as evidenced by their motion, that the mortgages were obligations also of Quincy Money Exchange although there is no notation on the mortgage agreement or on any document in the record to that effect.↩
20. On their income tax return filed for 1971 petitioners simply listed certain expenses, i.e., medical, State tax, and interest, the sum of which appears to exceed the standard deduction. Those expenses were never added up or placed in the proper areas of the return to indicate they wished to itemize deductions and no evidence as to those expenses was presented anywhere in the record. On their 1972 return petitioners claimed $ 1,827.37 (15 percent of reproted adjusted gross income) as a standard deduction and respondent's computations allowed a $ 2,000 standard deduction.↩
21. Furthermore, in view of our determination that petitioners increased their net worth each year in taxable years 1971, 1972, and 1973 and that petitioners lack an adequate explanation as to the source of that increase in conjunction with respondent's reasonable explanation of the source, i.e., diverted funds from Quincy Money Exchange and horse race gambling winnings, we find that respondent's determination that the source of petitioner's increase in net worth was taxable income is not erroneous. See Holland v. United States, 348 U.S. 121 (1954); United States v. Massei, 355 U.S. 595 (1958); Kramer v. Commissioner, 389 F.2d 236↩ (7th Cir. 1968), affg. a Memorandum Opinion of this Court.
22. If we accept petitioner's figures for 1971, technically there would be a small decrease in net worth for that year but that is more than compensated for by the nondeductible expenditures.↩
23. We note that it was during this cooperative period that Mr. Peppers consistently represented to both special agent Abbott and special agent Milliken that the loans from Robert Stone were to Quincy Money Exchange and not personal.↩